[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10038

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00126-CR-IPJ-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GREGORY LOUIS CLARKE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(March 20, 2009)**

Before BIRCH and PRYOR, Circuit Judges, and STROM,[*] District Judge.

BIRCH, Circuit Judge:

---

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

Defendant-appellant Gregory Louis Clarke ("Clarke") appeals his convictions and sentences on three counts of tax fraud in violation of 26 U.S.C. § 7206(1). On appeal, Clarke argues that: (1) the district court violated his Sixth Amendment right to a jury drawn from a fair cross-section of the community when it denied his motion to strike the jury venire based upon its racial make-up; (2) the evidence was insufficient to support the guilty verdict; and (3) the district court erred in calculating the tax loss amount and in applying the "sophisticated means" enhancement under the United States Sentencing Guidelines (the "guidelines"). After review of the record and consideration of the parties' briefs and oral arguments, we AFFIRM.

## I. BACKGROUND

Clarke has been pastor of New Hope Baptist Church ("the church") and Superintendent of New Hope Christian School ("the school") in Birmingham, Alabama, since 1986. Clarke also served as interim manager of the New Hope Federal Credit Union ("the credit union") in 2001. Clarke received separate compensation, all paid by the church, for the services he rendered in each of these capacities. Clarke also received a $36,000 per year non-taxable minister's housing allowance, which was deposited into an account held by the church at Colonial Bank.

In January 2004, John Quartapella, an agent with the IRS's Criminal Investigation Division, began investigating Clarke after receiving an anonymous letter. As part of his investigation, Quartapella traced payments made by the church and the school to various sources on Clarke's behalf or for Clarke's benefit between 2000 and 2002 and determined that Clarke failed to report income of $11,205.94, $28,715.15, and $70,450.01 on his 2000, 2001, and 2002 tax returns, respectively.[1] A federal grand jury subsequently returned a three-count indictment charging Clarke with willfully filing false tax returns for tax years 2000 (Count One), 2001 (Count Two), and 2002 (Count Three), all in violation of 26 U.S.C. § 7206(1).

Before a jury was selected for Clarke's trial, Clarke moved to exclude the jury venire on the grounds that only three of its thirty-eight members were African-Americans. The courtroom deputy informed the district judge that the venire "wasn't specially drawn" and had been called in for both Clarke's trial and another criminal case. The district court denied the motion, noting that the venire was "just a regular jury pool" that was "from the southern division" of the district.

At trial, Lily Walton, Sandra Edwards, and Charles Trull, the individuals who prepared Clarke's 2000, 2001, and 2002 tax returns, respectively, testified that

---

[1]William Coker, an IRS auditer who analyzed the information gathered by Quartapella, confirmed these figures.

3

Clarke's returns were based solely on the W-2's and 1099's Clarke presented to them and that Clarke did not declare any additional income from other sources. At no time was Clarke advised that he was not required to report income not reflected on his W-2's or 1099's. Clarke reviewed the returns before they were filed with the Internal Revenue Service ("IRS") and never indicated that they were inaccurate or that they otherwise misstated his tax liability.

Quartapella testified that in 2000, the school paid Clarke's disability insurance premiums on his behalf directly to Franklin Life Insurance Company and also made monthly payments on a loan Clarke had taken out in 1999 to purchase a Hyundai Tiburon for his daughter. Several other witnesses testified that in 2000 they had paid Clarke fees for speaking engagements; "bird-dog" fees for referring customers to a local car dealership; referral fees for sending loans to a mortgage company; and a $6600 "finder's fee" from Cameron Homes for bringing in investors to fund a real estate development project. Clarke did not report any of this income on his 2000 tax return.

With respect to 2001, Quartapella testified that the church paid Clarke's life insurance premiums, totaling over $6000, and that the school continued to pay Clarke's disability insurance premiums and the monthly payments on Clarke's daughter's car loan. In addition to these benefits, the church paid Clarke a salary

4

of $750 every two weeks ($15,000 per year) for serving as interim manager of the credit union.[2] Mark Nixon, the church's Chief Financial Officer since 2001, testified that these $750 biweekly checks, which were drawn from the church's operating account, were deposited directly into Clarke's housing-allowance account and thus were not routed through the payroll system. According to Nixon, only he and the chairperson of the church's board of trustees had the authority to write checks out of the housing-allowance account.

With respect to 2002, Quartapella's investigation revealed that the school, in addition to paying Clarke's disability insurance premiums and car loan payments, made various other miscellaneous payments on Clarke's behalf, including $177.89 on a time-share property Clarke owned; $45 for Clarke's water bill; and $708 on Clarke's homeowner's insurance policy.[3] In total, Clarke received $10,308.21 in unreported income from the school in 2002.

Most significantly, however, Clarke received $60,000 from the church for his work at its South Avondale location. According to the 2002 budget for South Avondale, the $60,000 was designated for "pastor's housing expenses" and listed

---

[2] Clarke also received fees for speaking engagements and a $100 "bird-dog" fee from Edwards Chevrolet.

[3] The $45 water bill and $708 homeowner's insurance premium payment were charged against Clarke as unreported income because the school made these payments over and above the $36,000 housing allowance.

under the heading "salaries."  R5 at 637. Nixon testified that the church did not give this money directly to Clarke, but deposited it into the church's savings account at the credit union.  Clarke brought Nixon his bills as they became due and Nixon paid them at Clarke's direction until the amounts disbursed totaled $60,000.  Out of this $60,000, Nixon paid off Clarke's personal credit card debt and the loan on the Tiburon and also wrote checks to cover Clarke's cosmetic dentistry and repairs to Clarke's home, including repainting and gutter work.  Quartapella testified that although the total amount paid out on Clarke's behalf was less than $60,000, the remaining money was transferred into Clarke's housing allowance account.  None of the checks written out of the church's accounts for Clarke's benefit in 2001 or 2002 were paid directly to Clarke.

Quartapella further testified that despite what Clarke had reported on his tax returns, Clarke had full knowledge of the extent of his income.  Records Quartapella had subpoenaed during his investigation showed that Clarke had disclosed an annual income of $113,000 on the credit application he completed in order to obtain financing for his Lexus RX300, and had disclosed an annual income of $115,000 both on an application for a platinum MasterCard and on an application to amend his life insurance policy.  Moreover, from 2000 to 2002, Clarke owned an interest in two time-shares, paid for expensive cosmetic dental

6

work, and purchased numerous luxury items, including a 2.73-carat diamond ring, a projection television, a camcorder, a DVD player, and custom-made clothes. According to Quartapella, the excessiveness of Clarke's lifestyle relative to his reported income was indicative of fraud.

At the conclusion of the government's case-in-chief, Clarke moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), arguing that the government failed to prove all the elements of the crimes charged. The district court denied the motion. Clarke then presented several witnesses who testified that the $60,000 payment from the church was a "gift" and not compensation for services rendered. These witnesses conceded, however, that there was no written evidence, either in the minutes from the meeting in which the 2002 budget was discussed or in the budget itself, that the $60,000 payment was intended as a gift. They further conceded that this amount was identified in the 2002 budget for "Pastor housing expenses," and was listed under the heading "salary." Id. at 714. Clarke renewed his motion for a judgment of acquittal at the close of all the evidence, and it was again denied. The jury subsequently convicted Clarke on all three counts of the indictment.

The court set a sentencing hearing and ordered a presentence investigation report ("PSI"). The PSI recommended a base offense level of 14, based on a tax

loss of $35,684, and applied a two-level enhancement under U.S.S.G. § 2T1.1(b)(2) after finding that Clarke used sophisticated means to conceal his fraud from the IRS. At sentencing, Clarke objected to the tax loss amount, arguing that it should be calculated as if he had legally amended his tax return to reflect a filing status of married, filing jointly. He also argued that his was a "routine tax case" and that the "sophisticated means" enhancement was therefore inappropriate. R7 at 13. The district court overruled Clarke's objections, adopted the PSI, and sentenced Clarke to twenty-one months' imprisonment. Clarke now appeals both his convictions and sentences.

## II. DISCUSSION

On appeal, Clarke argues that: (1) the district court's denial of his motion to strike the jury venire, on the grounds that only three of its thirty-eight members were African-American, violated his Sixth Amendment right to a jury selected from a fair cross-section of the community; (2) the evidence was insufficient to establish guilt beyond a reasonable doubt; and (3) the district court erred in determining the tax loss amount and in finding that he used sophisticated means to conceal the fraud. We address each argument in turn.

A. Motion to Strike Jury Venire

"The Sixth Amendment guarantees a criminal defendant the right to be

8

indicted and tried by juries drawn from a fair cross-section of the community."

United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995). A defendant

establishes a prima facie violation of the fair-cross-section requirement by showing

that: (1) the allegedly excluded group is a "'distinctive' group in the community";

(2) the representation of this group in the venire from which the jury was selected

was not "fair and reasonable in relation to the number of such persons in the

community"; and (3) the under-representation was due to "systematic exclusion of

the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364, 99

S. Ct. 664, 668 (1979).

Clarke contends that while African-Americans made up just under eight

percent of the jury panel, the 2000 census as reported by the University of

Alabama showed that African-Americans represented approximately twenty-one

percent of the population of the Northern District of Alabama. See Appellant's

Brief at 22. While we have held that the second element is not satisfied where the

absolute disparity between the percentage of the distinctive group among the

population eligible for jury service and the percentage of the distinctive group on

the jury panel is ten percent or less, see Grisham, 63 F.3d at 1074, Clarke's

challenge to the jury selection process is nevertheless unavailing because he has

presented no evidence showing that the under-representation in this case was due

9

to systematic exclusion of African-Americans. Accordingly, Clarke has failed to establish that the jury selection process violated the Sixth Amendment. See United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984) (failure to establish any element of prima facie case is fatal to Sixth Amendment challenge to jury selection process).

B. Sufficiency of the Evidence

We review de novo the sufficiency of the evidence in a criminal trial, viewing the evidence in the light most favorable to the government, and must uphold a conviction "unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). In evaluating the evidence, all reasonable inferences and credibility choices are made in support of the verdict. See United States v. Mieres-Borges, 919 F.2d 652, 656 (11th Cir. 1990).

To sustain a conviction under 26 U.S.C. § 7206(1), the government must prove that: (1) the defendant willfully made and subscribed to a tax return; (2) the return contained a written declaration that it was made under penalties of perjury; (3) the defendant did not believe that the return was true as to every material matter; and (4) the return was false as to a material matter. See 26 U.S.C. § 7206(1).

10

Clarke does not dispute that he received over $110,000 from the church, school, and other sources during the three-year period from 2000 to 2002, but asserts that his failure to report this income on his tax returns was not willful. Clarke's argument is without merit. The government presented ample evidence that Clarke knew his income exceeded the amounts he reported on his tax returns and that he had the opportunity to review and correct his returns before filing them with the IRS. Viewing the evidence in the light most favorable to the government, we have no difficulty finding that it was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Clarke willfully filed tax returns in which he knowingly and significantly under-reported his income for tax years 2000, 2001, and 2002, and that he was aware of their falsity when he signed and subscribed them under penalties of perjury.

C. Clarke's Sentence

1. Tax Loss Amount

Clarke argues that the court should have calculated the tax loss based not upon his tax liability under the original return, which he filed as married, filing separately, but upon what his tax liability would have been had he amended his return to reflect a filing status of married, filing jointly. He asserts that if he had filed as the latter, the loss would have been reduced from $35,811 to $28,186,

11

resulting in a base offense level of 12 rather than 14. See U.S.S.G. § 2T4.1. The government responds that the tax loss was correctly based on the original returns because the "tax loss" is the loss the defendant intends when he files the fraudulent return. Because this claim involves an interpretation of the sentencing guidelines, our review is de novo. United States v. Hunerlach, 197 F.3d 1059, 1069 (11th Cir. 1999) (reviewing de novo district court's inclusion of interest and penalties in tax loss calculation under U.S.S.G. § 2T1.1).

The guidelines provide that where, as here, the offense involved the filing of a fraudulent or false tax return, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1). Although we have not decided the issue of whether a defendant's unclaimed deductions or losses may be taken into account in determining tax loss for purposes of § 2T1.1(c)(1), several other circuits have taken the government's position and have held that the "tax loss" is the amount of loss the defendant intends to bring about, not the amount of loss to the government that actually results, and therefore, unclaimed deductions or other reductions in tax liability that are unrelated to the offense of conviction may not be used to offset the tax loss amount. See United States v. Blevins, 542 F.3d 1200, 1203 (8th Cir. 2008), cert. denied, 129 S. Ct. 1024 (2009); accord United States v.

12

Delfino, 510 F.3d 468, 472-73 (4th Cir. 2007), cert. denied, 129 S. Ct. 41 (2008);

United States v. Phelps, 478 F.3d 680, 682 (5th Cir.) (per curiam), cert. denied,

128 S. Ct. 436 (2007); United States v. Chavin, 316 F.3d 666, 677 (7th Cir. 2002);

United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999); United States v.

Tandon, 111 F.3d 482, 490 (6th Cir. 1997); United States v. Valentino, 19 F.3d

463, 465 (9th Cir. 1994). But see United States v. Gordon, 291 F.3d 181, 188 (2d

Cir. 2002) (holding that district court erred in refusing to consider potential

unclaimed deductions in sentencing analysis).

We join the majority of the circuits that have addressed this issue and hold

that "tax loss" under U.S.S.G. § 2T1.1(c)(1) is the amount of loss the defendant

intends to create when he falsifies his tax return and must therefore be calculated

based upon the fraudulent return. In this case, the object of Clarke's offense was

the amount by which he underreported and fraudulently misstated his taxable

income on his 2000, 2001, and 2002 returns. That his tax liability may have been

lower had he filed as married, filing jointly rather than married, filing separately is

thus irrelevant to the determination of the amount of loss to the government that he

*intended* when he underreported his income. See Chavin, 316 F.3d at 677

("[R]eference to other unrelated mistakes on the return such as unclaimed

deductions tells us nothing about the amount of loss to the government that

13

[defendant's] scheme intended to create."). Accordingly, the district court did not err in computing the tax loss based on the fraudulent return Clarke actually filed, and not on the tax return Clarke could have filed but did not.

2. "Sophisticated Means" Enhancement

Clarke also argues that the district court erred in applying the two-level "sophisticated means" enhancement under U.S.S.G. § 2T1.1(b)(2) because he never directed anyone to hide the payments that were made on his behalf and the existence of an audit trail belied any purposeful concealment. We review the district court's findings of fact related to the imposition of sentencing enhancements, including a finding that the defendant used sophisticated means, for clear error. United States v. Robertson, 493 F.3d 1322, 1329-30 (11th Cir. 2007). Under this standard, we will not disturb a district court's findings "unless we are left with a definite and firm conviction that a mistake has been committed." United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005) (quotation marks and citation omitted). Notwithstanding the deferential nature of our review, "we are not required to rubber stamp the district court's findings simply because they were entered." Id. (quotation marks and citation omitted).

The sentencing guidelines allow the district court to enhance a defendant's base offense level by two levels if the offense involved "sophisticated means."

14

U.S.S.G. § 2T1.1(b)(2). The commentary describes "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," including "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id. § 2T1.1(b), comment. (n.4). Although the mere failure to report income to an accountant does not involve sophisticated means, see United States v. Barakat, 130 F.3d 1448, 1457 (11th Cir. 1997), a defendant need not use offshore bank accounts or transactions through fictitious entities in order for the enhancement to apply, see United States v. Campbell, 491 F.3d 1306, 1315-16. (11th Cir. 2007).

In Barakat, we concluded that where the defendant had a mortgage company for whom he performed consulting work deposit his $15,000 fee into an attorney's trust account, the district court did not clearly err in finding that the defendant had used "sophisticated means" to conceal his tax evasion. Because the fee was routed through the trust account, "[the defendant] could fail to disclose the . . . payment[] knowing that, in the absence of a Form 1099, it was unlikely the IRS would ever become aware of that income." Barakat, 130 F.3d at 1457.[4] In Campbell, we held

_____

[4] In Barakat, the defendant was convicted of and sentenced for both tax evasion and mail fraud. We found that application of the sophisticated means enhancement with respect to the tax evasion conviction, though a "close question," was not clear error, but remanded the case because it would have been clear error had the district court found that the defendant used

15

that the district court's application of the sophisticated means enhancement was not clear error where the defendant was found to have utilized campaign accounts and credit cards issued to other people to conceal cash expenditures.  See 491 F.3d at 1315.  In so holding, we noted that "Campbell's deceptive practices were at least as sophisticated as the practice at issue in Barakat," and that, in terms of the degree of sophistication, hiding assets or transactions through the use of a campaign fund was no different than hiding assets or transactions through the use of fictitious entities, corporate shells, or offshore financial accounts.  Id.

As in Barakat and Campbell, we are not in this case left with a definite and firm conviction that the district court erred in finding that Clarke used sophisticated means to hide his tax evasion scheme.  The record reflects that Clarke concealed the true extent of his income by: (1) depositing his salary from the church and the credit union into accounts that were not registered in his own name; (2) instructing the church to make payments out of these accounts directly to his personal creditors; and (3) having the school and the church pay his life and disability insurance premiums directly to the insurance carriers.  For purposes of the sophisticated means enhancement, we see no material difference between concealing income and transactions through the use of third-party accounts, as was

---

sophisticated means to conceal his mail fraud conspiracy and it was not clear from the record with respect to which conviction the enhancement was applied. See 130 F.3d at 1457-58.

the case here, and using a corporate shell or a fictitious entity to hide assets. <u>See</u> U.S.S.G. § 2T1.1, comment. (n.4); <u>see</u> <u>Campbell</u>, 491 F.3d at 1315-16. The district court did not clearly err in finding that Clarke's activity, which covered a three-year period and required intricate planning, involved the use of sophisticated means.

## III. CONCLUSION

Clarke appeals his convictions and sentences for tax fraud. We conclude that: (1) the district court properly denied Clarke's motion to exclude the jury venire; (2) there was sufficient evidence from which a reasonable jury could have found Clarke guilty of the charged offenses; and (3) the district court correctly calculated the applicable guidelines range. Accordingly, Clarke's convictions and sentences are **AFFIRMED.**