[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13200
Non-Argument Calendar

_____

D. C. Docket No. 07-20636-CR-RWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONALD HOWARD MERKER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 19, 2009)

Before DUBINA, Chief Judge, TJOFLAT and HULL, Circuit Judges.

PER CURIAM:

This appeal arises out of a scheme to smuggle aliens through the Miami

International Airport ("the Airport").  Ronald Howard Merker ("Merker"), a former Customs and Border Protection ("CBP") agent at the Airport, appeals his convictions and sentences for bribery, 18 U.S.C. § 201(b)(2)(C), conspiracy to commit an offense against the United States for financial gain, 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii), and bringing aliens into the United States for financial gain, 8 U.S.C. § 1324(a)(2)(B)(ii).   After review, we find no reversible error and affirm.

## I.  Factual Background

On September 26, 2007, federal authorities charged Merker and co-defendants Clodoaldo Ribeiro-Albequerque ("Ribeiro"), Sidney Herberth Sathler ("Sathler"), and Alair Campos ("Campos") with engaging in an alien smuggling and bribery scheme.

The government's theory of the case was this.  Ribeiro would arrange to have the illegal aliens brought to the Airport.  Once they got there, Ribeiro would direct them to Merker's booth.  Merker would then pass them through customs in violation of internal operating procedures and federal law.  At times, Ribeiro relied on others—Campos and Sathler—to help him steer aliens through Merker's security line.  The aliens would pay Ribeiro who would in turn pay Merker.

Merker was charged with (1) one count of bribery, 18 U.S.C.

2

§ 201(b)(2)(C); (2) one count of conspiracy to commit an offense against the United States by bringing aliens into the country for financial gain during the time period of October 31, 2005 to July 25, 2007, 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii); and (3) five counts of bringing aliens into the United States for financial gain, 8 U.S.C. §§ 1324(a)(2)(B)(ii) and 2.  He was charged with smuggling the following five aliens into the country on specific dates: (1) Solange Duarte on October 31, 2005; (2) Agnaldo Duarte on February 1, 2006; (3) Daniele Watanabe on July 7, 2007; (4) Daniele Mascarenhas on July 25, 2007; and (5) Rosewelt Oliveira on July 25, 2007.

Co-defendants Ribeiro, Sathler, and Campos pled guilty to the conspiracy count of the superseding indictment.  Only Merker went to trial.  The jury convicted Merker on all seven counts.

### A.  The Government's Case-in-Chief

The government put forth a number of witnesses and a wealth of evidence. First, Jose Castellanos, a Chief with CBP, testified about CBP passenger screening procedures at the Airport.  Castellanos testified that, generally, CBP officers stationed in booths at the Airport's Passport Control section screen individuals as they arrive from international flights.

During initial inspections, CBP officers fingerprint and photograph all

3

nonimmigrants who have visas. Each CBP officer carries an admission stamp that contains a specific number. After this "primary" screening, a reviewing officer either admits the person or refers her to "secondary" for additional screening. Officers are required to refer passengers to secondary if they believe that the passenger is using fraudulent identification documents, is being evasive, or if the computer records check reveals a problem.

Castellanos noted that during both initial and secondary screening, CBP relies on the Treasury Enforcement Communication ("TEC") system to check records. This system shows whether a passenger has a criminal record or has overstayed a visa. The TEC's Advanced Passenger Information System ("APIS") also provides flight information about the passengers. Officers are barred from accessing these records for non-work reasons.

Cheryl Joann Arnold Castellanos, a CBP enforcement officer, testified about computer records obtained from the TEC system. These records listed work schedules and booth assignments for the four specific dates that the five aliens listed in the indictment entered through Merker's booth, (October 31, 2005, February 1, 2006, July 7, 2007, and July 25, 2007), and contained information about aliens processed on those days.

According to Cheryl Castellanos, the TEC records showed that Merker was

4

assigned to Booth 8 on the four dates in question and that he processed Solange Duarte, Daniele Watanabe, Rosewelt Oliveira, and Daniele Mascarenhas on those dates. APIS records for February 1, 2006, revealed that co-defendant Campos and Agnaldo Duarte traveled from Brazil to the United States and arrived during Merker's shift.

On cross-examination, Cheryl Castellanos testified that Merker often worked the night shift, had done so for several years, and that he requested the shift. She described him as experienced and noted that he often worked in secondary. She also claimed that Merker was a senior officer and that he knew that passengers with temporary stamps, which indicated that they were in the process of becoming legal permanent residents, had to be sent to secondary.

The smuggled aliens also testified. Daniele Mascarenhas, a Brazilian citizen, testified that she entered the United States through the Airport on July 25, 2007 and that Merker was the inspector who admitted her. Because Mascarenhas previously had overstayed an American visa in 2000, she knew that reentry into the United States would be difficult. So, in 2006, she met Ribeiro in Brazil. Ribeiro told her that he had a friend who worked for immigration and promised that he could smuggle her in for a $2,000 fee. Mascarenhas accepted Ribeiro's offer and paid him. On July 25, 2007, she flew to the United States through Miami with

Ribeiro and another man. With Ribeiro by her side, Merker processed her through customs. Although Merker examined her passport, he asked her no questions and admitted her. On cross-examination, Mascarenhas admitted that nothing in her passport suggested that Mascarenhas overstayed her visa and that she might have been admitted without paying Ribeiro.

Rosewelt Oliveira, a Brazilian citizen, testified that he came to the United States on an H1 visa in October 1999. He violated the terms of his visa by changing jobs and subsequently returned to Brazil. Years later, he decided to return to the United States with his children. He met with Ribeiro, who offered to get him an adulterated passport to assist his illegal entry into the United States for $12,000. Ribeiro told Oliveira to mail his passport to Oliveira's son who was living in the United States. Oliveira sent the passport, and it was returned to him by mail, but with an additional stamp.

On July 25, 2007, Ribeiro, Oliveira, and another woman (presumably Mascarenhas) traveled to the United States by plane. Once they arrived, Ribeiro and Oliveira went through customs. Oliveira testified that during inspections he stood in line directly behind Ribeiro. Both men went through Merker's booth. Merker examined Oliveira's newly adulterated passport and allowed him to proceed.

Thomas Cason, a Special Agent with ICE, also testified. Cason explained that an ADIT stamp shows that an alien has permanent resident status and includes the individual's alien number (or "A number"). The government showed Cason a copy of the ADIT stamp from Rosewelt Oliveira's passport. Cason testified that the A number on the stamp was incorrectly formatted and had too many digits.

Matthew Couch, a Special Agent with Immigration and Customs Enforcement ("ICE"), testified that ICE suspected Ribeiro of alien smuggling and that Couch assisted with the investigation. According to Couch, immigration officials deported Ribeiro after an October 2001 drug conviction. Couch also stated that Ribeiro obtained a fraudulent passport under the name "Johnny Rivera."

Shane Glassing, a Special Agent with the Department of Homeland Security's Office of the Inspector General, echoed Couch's testimony. Glassing added that on July 25, 2007, Ribeiro, Mascarenhas, and Rosewelt Oliveira entered the United States through Merker's inspection line. Glassing noted that Rosewelt Oliveira's passport stamp indicated that he was in the process of becoming a legal permanent resident, and therefore, should have been sent to secondary. Instead, Merker admitted him.

The government entered phone records into evidence of all calls made to and from Merker's cellular phone between November 2005 and September 2007. Two

7

of the numbers were registered to Jose Neto—another of Ribeiro's aliases. Merker's and Ribeiro's phones connected 968 times during the four dates in the indictment. Merker contacted Ribeiro 793 times; Ribeiro contacted Merker 175 times. But none of the calls was recorded.

Co-defendant Campos testified that he and Ribeiro agreed to smuggle aliens into the United States on four different occasions. According to Campos, Ribeiro said that he knew an immigration officer who would help with the scheme. Campos would accompany the alien from Brazil to the United States. When the flight arrived, Campos would call Ribeiro. Ribeiro would tell Campos which line led to Merker's booth. Campos then would guide the alien through the line. Campos admitted that he never saw Merker outside of the Airport or spoke to him on the phone. Campos earned $1,000 for every alien he helped smuggle. Campos admitted that he helped smuggle Agnaldo and Solange Duarte through Merker's booth.

Selma Oliveira, a Brazilian citizen, testified that Ribeiro, Merker, and Campos helped smuggle her into the United States from Brazil. Selma Oliveira met with Ribeiro in Brazil. Because she had previously overstayed an American visa, she thought she needed Ribeiro's help. Ribeiro guaranteed admission—provided that she could secure a seat on a particular incoming flight.

Ribeiro emphasized that the flight he selected was important, and he instructed her to cancel the flight if it was substantially delayed since "the guy who was working the booth would be leaving in the morning." Ribeiro also recommended that Oliveira use her sister's passport since the two looked alike.

On February 1, 2006, Selma Oliveira arrived at the Airport, met Campos, and followed him through Merker's line. Merker said nothing to her, took no fingerprints, and processed her quickly. She paid Ribeiro $5,000 for his services. She later asked Ribeiro to smuggle in her son for $2,500. Again, Ribeiro delivered.

Solange Duarte, another Brazilian citizen, testified that she entered the United States on October 31, 2005 and identified Merker as the customs officer who admitted her. Solange Duarte said that her application for a visa to the United States was denied. In response, her brother, Agnaldo Duarte, contacted Ribeiro. Ribeiro met with Solange Duarte and guaranteed her admission to the United States "[b]ecause the guy from immigration was going to go ahead and invent the story and then bought off [sic]." Ribeiro told her that Campos would escort her through immigration screening.

Solange Duarte gave her passport to Ribeiro. He adulterated it by adding pages and stamps to make it look like she was a legal permanent resident. Once

9

Solange Duarte arrived, she was processed through Merker's line, showed Merker the passport, and was admitted.

Solange Duarte's brother, Agnaldo Duarte, testified that he entered the United States on February 1, 2006. He stated that Ribeiro was reputed to have the power to get people into the United States. Agnaldo Duarte paid Ribeiro $20,000 to smuggle him and his sister into the United States. Ribeiro "guaranteed 100 percent" that his efforts would succeed because "he had someone from immigration who would facilitate [Duarte's] entrance."

Agnaldo Duarte testified that he traveled to the United States with Selma Oliveira, Campos, and Campos's aunt Luzia. When they arrived at the Airport, Campos instructed them to use Merker's line. Merker examined Agnaldo Duarte's passport and admitted the others.

Co-defendant Sathler, who also worked for Ribeiro's construction company, described the scope of his agreement with Ribeiro to smuggle aliens into the United States. The strategy was to smuggle aliens who had overstayed their visas, to adulterate passports using a fake stamp, and to rely on Ribeiro's contact—Merker—to process the aliens through customs.

Sathler indicated that Ribeiro set up a meeting with Merker on a street corner near Merker's apartment. Sathler testified that Ribeiro told him to

remember Merker's face since the scheme required processing people through Merker's line. Sathler testified that he personally escorted aliens on about fifteen flights from Brazil to the United States. Twelve of the smuggling attempts succeeded and three failed. According to Sathler, the three failures were triggered by problems in Brazil—not hangups at the Airport. Once the flights reached the Airport, Sathler sent the aliens through Merker's line (while Sathler went through another line to avoid suspicion).

Sathler testified that, on one occasion, Ribeiro gave him a fake immigration stamp. Sathler said that he used that stamp to mark Rosewelt Oiveira's passport after Oliveira's son delivered it to him. Sathler stamped the passport and sent it back to Oliveira's son. Sathler explained that he used the stamp to trick Brazilian officials into authorizing aliens to travel to the United States and that the stamp required an official security ink that Ribeiro provided.

Sathler testified about his and Merker's role in the July 7, 2007 smuggling attempt. On that day, Sathler, Ribeiro, and Merker attempted to smuggle Giomar Martin DeMelo and Daniele Watanabe into the United States. Sathler recounted that DeMelo and Watanabe's flight landed at the Airport at 4:30 a.m. After they arrived, Sathler told Watanabe and DeMelo that Sathler would go through one immigration line while Watanabe and DeMelo were to enter the line immediately

11

to his right. Once Merker emerged from Booth 8, Sathler pointed at Merker and told Watanabe to go to Merker's line. Instead of proceeding to Booth 8 (Merker's booth) with Watanabe, DeMelo followed Sathler to Booth 9. Sathler gestured to DeMelo that he should enter Merker's booth. DeMelo went through Booth 7 instead. Watanabe, who was processed through Merker's booth, was admitted. DeMelo was not.[1] The government played a videotape of the incident at trial.

Rey Rodriguez, a special agent with the DHS Office of the Inspector General, testified that Merker improperly accessed computer records known as terminal playbacks. These records showed what types of computer searches Merker conducted on the relevant nights.[2] Rodriguez testified that on July 7, 2007, Merker made unauthorized searches for "lookouts" on an incoming flight from Rio de Janeiro. A "lookout" from the National Crime Information Center indicates that a passenger has a criminal history or an outstanding warrant. The results showed a primary lookout on DeMelo for human smuggling and trafficking and a flag

_____

[1]Sathler also made comments that may have benefitted the defense. For example, his memories were hazy on exactly when Ribeiro told Sathler to remember Merker's face, and he did not know whether Ribeiro was speaking Portugese at the time. Sathler also testified that Ribeiro said that he was connected to an official even higher up than Merker. Further, Sathler stated that Ribeiro was a "liar" and a "braggart." But whether Sathler was telling the truth was an issue for the jury to decide.

[2]Although Rodriguez testified that Merker conducted a search for Johnny Rivera, one of Ribeiro's known aliases, there was also evidence suggesting that there was a "lookout" for another Johnny Rivera.

12

requiring DeMelo to report to secondary on arrival. Two hours after his first search, Merker searched DeMelo's records again to check whether anyone had processed him through immigration. After the search, Merker called Ribeiro nine times throughout the morning—at 5:12 a.m., 5:14 a.m., 8:14 a.m., 8:16 a.m., 8:17 a.m., 8:19 a.m., 8:21 a.m., 8:22 a.m., and 11:16 p.m.. But another officer eventually processed DeMelo—not Merker.

## B. The Defense

On appeal, Merker argues that his defense was hampered by constant objections to his questions and interruptions by the district court. Therefore, we recount relevant portions of the defense testimony.

The defense first called Leonel Aguilar, who was a CBP supervisor from March 1997 until March 2007. Aguilar testified that he directly supervised Merker on a number of occasions, that between 8 and 12 CBP officers typically worked the night shift, and that Merker was trained in both primary and secondary screening.

Shortly after this testimony, the government initiated a series of objections to defense counsel's questions. The district court sustained nearly all of them. For example, the government objected to defense counsel asking Aguilar whether Merker was required to send all passengers to secondary. The district court sustained the objection on the ground that Aguilar's testimony could address only

13

the conspiracy's time frame. The government also objected to defense counsel asking Aguilar how frequently Merker worked in secondary. The district court overruled the objection, but cautioned defense counsel to "zero in on the night in question."

Aguilar testified that CBP authorized experienced officers to perform secondary screens at their booths (rather than sending passengers to the secondary area). In 2003, CBP required officers to personally escort passengers to secondary. The government objected that Aguilar's testimony about general airport procedures was irrelevant. The district court sustained the objection and stated that defense counsel "need[ed] to get the point."

Aguilar noted that passengers with ADIT stamps in their passports were, generally, referred to secondary. But if the staff was shorthanded on a particular night, experienced officers were authorized to question passengers with ADIT stamps at their own booths. Defense counsel showed Aguilar one of the adulterated passports with an ADIT stamp. Aguilar observed that the A number on the stamp had too many digits, but said that he would not have noticed the problem during a quick inspection.

Aguilar then explained how ADIT stamps are affixed on passports. The government, again, objected on relevance grounds, and the district court sustained

14

the objection. Just as Aguilar was explaining how it was not unusual to see an "SRC" number on a passport, the government objected again. The district court told Aguilar, "Sir, we're really not interested in what the officers do," and instructed him to confine his testimony to the particular document before him.

Aguilar claimed that in 2003 or 2004, CBP started using fingerprint machines. This prompted the district court to remark, "we're off the chart again." Defense counsel explained that the testimony was relevant since government witnesses testified that Merker often failed to take passenger fingerprints. The court stated, "Well, he wasn't there. So there's really not a lot of relevance here." Defense counsel asked more questions about fingerprinting procedures. For example, defense counsel asked whether fingerprint machines ever stopped working. The government objected, and the district court sustained the objection.

Defense counsel asked whether Aguilar had ever evaluated Merker's work performance. The government objected, and the district court sustained the objection. Defense counsel asked what officers did in the downtime between the arrival of flights. The government objected, again on relevance grounds, and the district court sustained the objection. Although defense counsel requested a sidebar, the district court rebuffed the suggestion and insisted that defense counsel keep it moving.

15

When Aguilar testified about whether CBP officers checked incoming flight records every night, the district court interrupted, insisted that such testimony had "absolutely no relevance," and asked Aguilar whether he knew the meaning of the word "relevant." Aguilar answered affirmatively.

Aguilar testified that CBP officers were required to process individuals within set time limits. The government objected. The district court sustained the objection and noted that "[t]his case is about certain dates certain times, and certain happenings, and so far we don't have that." Aguilar then testified that, during the time frame of the indictment, inspectors were required to process 45 passengers a minute. During the midnight shift, officers screened 2,000 to 3,000 passengers a night. At a sidebar, the district court instructed defense counsel to tie Aguilar's testimony to the specific dates mentioned in the indictment.

The defense called Jacob Achterberg, a former Chief with CBP who had also served as Merker's supervisor. In response to a question about Merker's duties, Achterberg said that Merker's experience and professionalism rendered him a senior inspector. The government objected, and the district court instructed Achterberg to answer only the question.

Achterberg testified that he frequently assigned Merker to work in secondary and that officers were not necessarily required to send all passengers with ADIT

16

stamps to secondary. Defense counsel asked whether an officer with Merker's experience was required to send passengers with ADIT stamps to secondary. The government objected to this question, and the district court sustained the objection. However, Achterberg testified that Merker had discretion as to whether to send a passenger with an ADIT stamp to secondary.

Achterberg discussed pre-September 11th procedures. The district court interrupted and instructed Achterberg to confine his testimony to the conspiracy's time frame (which began in 2005). The district court observed that Achterberg was "having a great deal of difficulty with relevance." Achterberg also testified that inspectors were required to administer ADIT stamps using security ink, but that ink shortages led to the use of other ink types. Following Achterberg's testimony, the defense rested.

At the close of the evidence, defense counsel argued that the district court had unduly limited the defense by requiring its witnesses to tie testimony to the dates listed in the indictment. The district court acknowledged the legitimacy of the objection, but noted that both witnesses ended up testifying about airport procedures.

Defense counsel moved for a mistrial on the ground that the district court's restrictions on Aguilar's and Achterberg's testimony "essentially limited and

17

hobbled the defense."  The district court denied the motion.

The jury convicted Merker on all seven counts of the superseding indictment.  Merker filed a written motion for a judgment of acquittal or, alternatively, for a new trial.  The district court denied both motions.[3]

## C.  Sentencing

The Presentence Investigation Report ("PSI") set Merker's base offense level at 14, pursuant to U.S.S.G. § 2C1.1(a)(1), because Merker was a public official.  The PSI recommended increasing Merker's offense level to 28 by adding: (1) two levels, pursuant to U.S.S.G. § 2C1.1(b)(1), because the offense involved more than one bribe; (2) six levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(D) and § 2C1.1(b)(2), because Merker received payments between $30,000 and $70,000; (3) four levels, pursuant to U.S.S.G. § 2C1.1(b)(3), because Merker was a public official in a high-level decision-making or sensitive position; and (4) two levels, pursuant to U.S.S.G. § 2C1.1(b)(4)(A), because Merker was a public official who facilitated entry of a person into the United States.  Merker's total offense level of 28 and criminal history category of I yielded an advisory guidelines range of 78 to 97 months in prison.

Defense counsel objected that the overlapping enhancements were

---

[3]During trial, Merker had made oral motions for a judgment of acquittal, which the district court also denied.

18

impermissible "double counting," that Merker was not a "public official in a high-level decision-making or sensitive position," and that the PSI's recommended sentence was substantively unreasonable (as compared to the sentences of his co-defendants). The district court rejected those arguments and adopted the PSI's recommended advisory guidelines range. The district court imposed a 78-month sentence, at the low end of that range, and a $12,000 fine.

## II. Discussion

Merker raises three types of claims on appeal—two evidentiary challenges and several issues relating to sentencing. We address each in turn.

### A. Merker's Ability to Present a Defense

Merker contends that the district court's evidentiary rulings and trial "manner" violated his right to present a defense and denied him a fair trial.[4]

---

[4]Citing his Sixth Amendment Confrontation Clause rights and his "right to present a defense, the right to present [his] version of the facts," see Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967), Merker argues that the district court improperly restricted his defense by constantly interrupting him and excluding relevant testimony. The government responds that Merker's claim should be treated as one implicating the Fourteenth Amendment's guarantee of due process and it points out that a passage in Washington v. Texas cited by Merker suggests as much. See 388 U.S. at 19, 87 S. Ct. at 1923 ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). Whether it is styled as a Fourteenth Amendment claim or one arising out some amalgam of the Fifth and Sixth Amendments, Merker's argument is that the district court prevented him from adequately defending himself.

First, Merker argues that the district court improperly restricted Achterberg

and Aguilar's testimony about general procedures at the Airport.  The government

had an opportunity to paint a picture of how things normally worked.  And it

argued that Merker's behavior was inconsistent with normal CBP protocol.

Merker claims he was denied the opportunity to counter that image.  Had he been

able to offer more evidence of CBP procedure, his behavior would have appeared

innocuous and innocent.  Second, Merker claims that the district court's constant

interruptions, "derogatory tone, and "implicit disapproval" of Merker' arguments

denied him a fair trial.

We reject Merker's arguments for a number of reasons.[5]  First, the district

court did not abuse its discretion in excluding certain testimony that was

untethered to the time frame of the conspiracy and irrelevant.  See Fed. R. Evid.

401, 403.  For example, defense witnesses did not know whether the fingerprint

---

[5]We review evidentiary rulings for abuse of discretion.  United States v. Anderson, 872 F.2d 1508, 1515 (11th Cir. 1989).  Even if the district court committed "constitutional error," we will not reverse errors that are "harmless."  See United States v. Candelario, 240 F.3d 1300, 1307 (11th Cir. 2001).  "Under the harmless-error standard articulated in Chapman and its progeny, a conviction may be affirmed only if the reviewing court conclude[s] that, on the whole record, the error was harmless beyond a reasonable doubt[.] Put differently, the reviewing court must consider whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  LaMarca v. Sec'y, Dep't of Corrs., — F.3d —, 2009 WL 1377235, at *11 (11th Cir. May 19, 2009) (citations and quotation marks omitted).  "[A] non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, or had but very slight effect."  United States v. Arias, 431 F.3d 1327, 1338 (11th Cir. 2005).

machines were malfunctioning on the dates listed in the indictment. At one point, Achterberg offered testimony about pre-September 11, 2001 procedures, even though the conspiracy began in 2005. Such testimony was properly excluded.

That the district court did not abuse its discretion in excluding such testimony undermines Merker's argument that he was denied the right to present a defense. Defendants do not have "an unfettered right" to offer irrelevant testimony. See Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988).

Second, Merker was given ample opportunity to present a robust defense. For starters, the district court allowed him to present evidence of CBP procedures (that inspectors were forced to process a large volume of individuals quickly, that they had discretion over when to send individuals to secondary, that Merker was an experienced inspector, that the adulterated passports were not obvious forgeries, etc.).[6] Aguilar and Achterberg provided much of that information. Admittedly, portions of their testimony were punctured by a number of objections, but this was not true for all of their testimony. For example, the district court overruled the government's objection and allowed Aguilar to testify that in some cases an

---

[6]Merker outlines four things that his witnesses were unable to prove as a result of the district court's interruptions: (1) Merker was an experienced, senior inspector; (2) Merker was not required to send passengers with ADIT stamps to secondary; (3) Merker was permitted to perform secondary work in his booth; and (4) manpower shortages forced inspectors to process people quickly. But Aguilar and other witnesses testified as to all of these facts. Defense counsel relied on many of these arguments during closing.

21

inspector does not have to refer an individual to secondary. The jury also heard that Merker was experienced and had the discretion to perform secondary inspections at his booth. Defense counsel had the opportunity to build on this evidence of CBP procedures to counter the government's depiction of how the CBP worked. Indeed, defense counsel relied on this evidence during closing argument.

Furthermore, the record does not support the suggestion that the district court impermissibly commented on the quality of the evidence, the credibility of the witnesses, or displayed a bias against Merker such that it impeded his ability to present a defense. See United States v. Verbitskaya, 406 F.3d 1324, 1337 (11th Cir. 2005) ("[I]n order to amount to reversible error, a judge's remarks must demonstrate such pervasive bias and unfairness that they prejudice one of the parties in the case."(alteration in original)) (quotation marks and citation omitted). To the extent that the district court "constantly" interrupted defense counsel, such interruptions were prompted by defense counsel's desire to consistently run afoul of the district court's evidentiary rulings.

Third, the sheer volume of record evidence showing Merker's guilt persuades us that any error was "harmless." The government presented a vast array of testimony and documentary evidence showing that Merker was guilty

22

beyond any reasonable doubt. We recounted the evidence above in great detail. In short, the government presented evidence about Merker's active involvement in the conspiracy on the critical dates in question. We are persuaded that there is no reasonable possibility that the alleged errors might have contributed to the convictions.

Lastly, Merker had the opportunity to cross-examine witnesses and to challenge the evidence against him. In short, the district court committed no reversible error.

## B. Co-Conspirator Evidence

Merker argues that the district court erred by admitting Ribeiro's out-of-court statements. While Ribeiro's out-of-court statements were hearsay, there is an exception for such a hearsay statement if it is "offered against a party and is . . . a hearsay statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).[7]

To fall within the co-conspirator hearsay exception, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is

---

[7]We review evidentiary rulings for abuse of discretion. Underwood, 446 F.3d at 1345-46. And we apply "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002) (quotation marks omitted).

23

offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir. 2006). The district court may consider the hearsay statements themselves when making this determination. Bourjaily v. United States, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781 (1987).

Merker argues that the only evidence showing his involvement in the conspiracy was the actual hearsay evidence itself—Ribeiro's statements. Therefore, the district court's reliance on only that evidence to prove its admissibility constituted impermissible "bootstrapping." The United States Supreme Court has never explicitly determined whether a district court can rely exclusively on the hearsay statements themselves for the purpose of determining their admissibility under Rule 801(d)(2)(E). See Bourjaily, 483 U.S. at 181, 107 S. Ct. 1281 ("We need not decide in this case whether the courts below could have relied solely upon Lonardo's hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence."); id. at 184, 107 S. Ct. at 2783 (Stevens, J., concurring) ("An otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility—it cannot lift itself into admissibility entirely by tugging on its own bootstraps.").

There is no need for us to address the issue of impermissible bootstrapping

24

here because ample evidence, unrelated to Ribeiro's out-of-court statements, shows that Merker was a member of the conspiracy. First, six witnesses (Solange Duarte, Agnaldo Duarte, Daniele Watanabe, Daniele Mascarenhas, Selma Oliveira, and Rosewelt Oliveira), testified that they were admitted to the United States illegally through Merker's booth. Co-defendant Campos testified that he personally escorted three illegal aliens, Solange Duarte, Agnaldo Duarte, and Selma Oliveira, and directed all three of them to enter Merker's line.

Co-defendant Sathler testified that he escorted Watanabe through Merker's line and that Watanabe was admitted. Sathler also explained that DeMelo's failure to enter Merker's booth doomed his admission to the United States.[8] Sathler testified that he had participated in fifteen smuggling attempts and directed aliens to enter through Merker's booth on every occasion.

Further, cell phone records showed that Merker and Ribeiro contacted each other 968 times between May 15, 2006 and August 17, 2007. This evidence combined with the evidence of frequent short calls on dates such as July 7, 2007 (the date Watanabe was smuggled in) and on July 25, 2007 (when Daniele Mascarenhas and Rosewelt Oliveira were smuggled in) supported the admission of Ribeiro's statements.

---

[8]Plus, computer record evidence showed that Merker searched for DeMelo's name prior to his arrival.

25

Therefore, there was independent, sufficient evidence showing (1) that a conspiracy existed, (2) that Merker and Ribeiro were involved in the conspiracy, and (3) that Ribeiro's statements were made in furtherance of the conspiracy. Accordingly, the district court did not err in admitting Ribeiro's out-of-court statements.

## C. Sentencing Issues

Merker raises three challenges to his sentence.[9]

First, Merker argues that the district court erred by increasing his offense level under the guidelines for being a "public official in a high-level decision-making or sensitive position," pursuant to § 2C1.1(b)(3) (authorizing a four-level increase). However, Merker easily falls under this label. Merker held "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1 cmt. n.4. The application notes list "agency administrator" and "law enforcement officer" as

---

[9]We review de novo a district court's interpretation and application of the Sentencing Guidelines. United States v. Louis, 559 F.3d 1220, 1224 (11th Cir.), cert. denied, — S. Ct. —, 2009 WL 1146748 (U.S. May 26, 2009) (No. 08-10013); United States v. Miranda, 348 F.3d 1322, 1330 (11th Cir. 2003). We review de novo a claim that the district court double-counted a sentencing factor. United States v. Dudley, 463 F.3d 1221, 1226 (11th Cir. 2006). And "[w]e review the district court's findings of fact related to the imposition of sentencing enhancements . . . for clear error." United States v. Clarke, 562 F.3d 1158, 1165 (11th Cir. 2009). "Under this standard, we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." Id. (quotation marks and citation omitted).

examples of the types of officials who fall under this broad category. Merker not only had substantial influence over whether an individual could enter the United States but also had law enforcement duties. Indeed, CBP officers carried weapons and had arrest powers. Further, CBP officers had "direct authority" to decide whether to admit an alien or to require them to produce additional documentation. Therefore, the district court did not err in classifying Merker as a "public official in a high-level decision-making or sensitive position."

Second, Merker argues that the district court engaged in impermissible double counting when it "repeatedly increased Merker's base [offense] level under U.S.S.G. § 2C1.1." Merker contends that the district court was wrong to treat him as both a "public official in a high-level decision-making or sensitive position," U.S.S.G. § 2C1.1(b)(3), and a "public official who facilitated . . . entry into the United States for a person," U.S.S.G. § 2C1.1(b)(4)(A).

"'Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" United States v. Dudley, 463 F.3d 1221, 1226-27 (11th Cir. 2006) (quoting United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999)). Unless the guidelines direct otherwise, this Court presumes "that the Sentencing

27

Commission intended for separate guideline sections to apply cumulatively." Id. at 1227. "'Double counting a factor during sentencing is permitted if the Sentencing Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing.'" Id. (quoting United States v, Stevenson, 68 F.3d 1292, 1294 (11th Cir. 1995)). Further, "[t]he offense level adjustments from more than one specific offense characteristic within an offense guideline are applied cumulatively (added together) unless the guideline specifies that only the greater (or greatest) is to be used." U.S.S.G. § 1B1.1 cmt. n.4(a).

The district court did not engage in impermissible double-counting because Merker's enhancement under § 2C1.1(b)(4)(A) was not fully accounted for in his enhancement under § 2C1.1(b)(3). The "public official in a high-level decision-making or sensitive position" enhancement, § 2C1.1(b)(3), generally speaking, applies to public servants with direct authority to make important governmental decisions. Notably, this enhancement is not tied to whether an individual admits a person into the United States, and no part of the applicable guidelines uproots our normal presumption that enhancements are cumulative.

In contrast, the enhancement for an official who facilitates "entry into the United States for a person" addresses the dangers caused by illegally admitting

28

persons into the United States. U.S.S.G. § 2C1.1(b)(4)(A). The concerns addressed by this enhancement are not "fully accounted" for, see Matos-Rodriguez, 188 F.3d at 1309, by applying the § 2C1.1(b)(3) enhancement. Indeed, § 2C1.1(b)(3) applies even if an official denies an alien's entry into the United States, in exchange for bribes; whereas § 2C1.1(b)(3) would not. Because the different enhancements address different aspects of Merker's crimes, we find no error in the district court's application of both enhancements.

Third, Merker argues that his sentence was unreasonable because (1) "virtually" the only factor that the district court addressed when imposing the sentence was Merker's role as an immigration inspector and (2) his sentence was three times as long as Ribeiro's sentence.

We review the substantive reasonableness of the sentence for an abuse of discretion. Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 597 (2007). A defendant challenging his sentence bears the burden of establishing that it is unreasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). The record does not support Merker's contention that the district court considered only one of the factors listed in 18 U.S.C. § 3553(a). The district court examined all of the relevant § 3553(a) factors, correctly calculated the guidelines range, and arrived at a reasonable sentence at the low end of the guidelines range. Any

29

disparity between Merker's and Ribeiro's sentences can be attributed to the

seriousness of Merker's crime, his breach of the public trust, and the fact that

Ribeiro pled guilty. Merker has failed to carry his burden to show that his sentence

was unreasonable. Therefore, we AFFIRM Merker's convictions and sentence.

   **AFFIRMED**.