[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14141

_____

D.C. Docket No. 1:13-cr-20231-UU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YOLANDA SOSA,

Defendant-Appellant.

_____

No. 13-14142

_____

D.C. Docket No. 1:13-cr-20231-UU-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ADRIAN VELAZQUEZ,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 3, 2015)

Before HULL, BLACK, and MELLOY,[*] Circuit Judges.

PER CURIAM:

Pursuant to written plea agreements, Yolanda Sosa and Adrian Velazquez (collectively, "Defendants") pled guilty to conspiracy to commit healthcare fraud. Defendants appeal two forfeiture orders entered by the district court after it imposed joint-and-several restitution against Defendants in the amount of $753,430.  These consolidated appeals involve the restitution amount and the forfeiture of two cars.  After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm.

---

[*]Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

## I. BACKGROUND

### A.    2011 Medicare Fraud

The factual proffers accompanying Defendants' plea agreements set forth the offense conduct as follows.  Between June 15, 2011, and October 7, 2011, Defendants met with a "cooperating doctor" and paid the doctor for prescriptions that Defendants could use to fraudulently bill Medicare.  Specifically, Defendants provided the cooperating doctor with Medicare beneficiary information and paid the doctor thousands of dollars to write prescriptions for expensive medications that were not actually given to any patients.  The doctor never saw or evaluated the patients, and instead wrote the prescriptions for whatever medications Defendants requested.  Defendants gave the fraudulent prescriptions to various pharmacies, which submitted false claims to Medicare based on the prescriptions.

As a result, Medicare paid the pharmacies approximately $753,430 based on the false claims.  The pharmacies paid Defendants over $60,000 for obtaining the fraudulent prescriptions.  Thus, Defendants' conduct resulted in a total fraud loss amount of $753,430.

### B.    Plea Agreements

On April 9, 2013, Defendants were charged in an 18-count indictment with various offenses arising out of the Medicare fraud scheme.  On June 26, 2013, Defendants executed substantially identical plea agreements, in which they agreed

to plead guilty to one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349.  In return, the government agreed to dismiss the remaining counts.

Under the express terms of their plea agreements, Defendants "agree[d] to entry of a personal money judgment in favor of the United States in the amount of $753,430, which represents the gross proceeds of the offense of conviction, pursuant to [18 U.S.C. § 982]."  To this end, Defendants "voluntarily agree[d] to forfeit all of [their] right, title, and interest in [two real properties located at 8550 N.W. 30th Avenue and 2500 N.W. 99th Street in Miami, Florida,] to the United States as substitute assets to satisfy the personal money judgment."

In the plea agreements, Defendants agreed knowingly and voluntarily to waive the following: any claim or defense under the Eighth Amendment—including any claim of excessive fine or penalty—with respect to the forfeiture; any right to a jury trial on the forfeiture; any statute of limitations with respect to the forfeiture; any notice of forfeiture proceedings; and "any right to appeal any order of forfeiture entered by the Court pursuant to the plea agreement."  The plea agreements also stated that Defendants were "aware that [their] sentence[s] had not yet been determined by the Court."

C.     **Plea Hearing**

During the joint plea hearing, Defendants confirmed that they had reviewed their plea agreements with counsel and understood each and every term of the agreements.  The district court reviewed the plea agreements' restitution and forfeiture provisions in detail.  With regard to the forfeiture provisions, the government stated that defense counsel had suggested paying the money judgment with a "substantial cash payment or some other payment plan" instead of forfeiting the two houses, and that the government, while not promising to agree to that proposal, would at least consider it going forward.

The district court confirmed Defendants' understanding that they were liable for repaying $753,430 to the government, and that they could not object to "any source to forfeiture" or otherwise challenge any forfeiture ordered against them.  In response to the district court's inquiry, Defendants stated that no one forced or coerced them to plead guilty or to agree to the forfeiture or the money judgment.

Defendants affirmed that they signed the factual proffer and agreed with each and every fact contained in the proffer.  Finding that Defendants were aware of the nature of the charges and the consequences of the pleas, the district court accepted Defendants' guilty pleas as knowing and voluntary and adjudicated them guilty of conspiracy to commit healthcare fraud.

### D.    Presentence Investigation Reports

The presentence investigation reports ("PSIs") outlined Defendants' assets, including: two houses, six cars (a 2000 Chevrolet Silverado, a 2001 Kia Sportage, a 2002 Chevrolet Corvette, a 2007 Cadillac Escalade, a 2012 Dodge Challenger, and a 2013 BMW 740i), and seven bank accounts.  Defendants held approximately $3000 in domestic bank accounts, and Sosa reported an additional $22,000 in an individual bank account at Banco Popular in the Dominican Republic.

In June 2005 (before the 2011 fraud), Sosa obtained a $180,000 mortgage loan on property located at 8550 NW 30th Avenue in Miami, Florida, which was worth approximately $124,033.  In April 2012 (shortly after the 2011 fraud), Sosa paid off the loan in full.  In July 2011 (during the fraud period), Defendants paid $40,000 to purchase property located at 2500 NW 99th Street in Miami, Florida, which was worth approximately $69,472.

In 2012, Defendants reported an adjusted gross income of $395,616—listed as "gambling proceeds"—on their joint federal tax return, and claimed a tax refund of $32,169.  The PSIs ultimately determined that Sosa's net worth was $204,213, and Velazquez's net worth was $42,256.

Neither defendant objected to the PSIs.

6

**E.    Sentencing**

On August 23, 2013, the district court held the sentencing hearing.  In explaining the circumstances of the offense, the government stated that Defendants "met with the cooperating doctor on a number of occasions" until the government "shut it down" and "pulled the [doctor's] proactive cooperation."  The government confirmed that the total loss amount of $753,430 was attributable to Defendants' transactions with the cooperating doctor, and that the four pharmacies involved received $13 or $14 million dollars from Medicare.  When the district court asked why the government would pay millions of dollars in claims that it knew to be fraudulent, the government responded that the Department of Health and Human Services was authorized to pay the claims as part of an undercover operation.

As to the money judgment, the government stated that it had recommended a sentence at the low end of the guidelines range, in part because Defendants had agreed to the money judgment of $753,430 and had indicated they intended to plead guilty early on in the process.  Defense counsel contended that Defendants did not actually receive most of the money fraudulently obtained from Medicare.  The government pointed out that Sosa and Velazquez—despite claiming to be a housekeeper and a mechanic, respectively—owned two houses and six cars.  The houses were purchased or paid off during or shortly after the 2011 conspiracy.

7

One of the cars, a 2013 BMW 740i, was purchased right before Defendants' arrest on April 18, 2013.

The district court sentenced each defendant to 24 months' imprisonment, at the low end of the advisory guidelines range.  The district court also imposed joint-and-several restitution in the amount of $753,430 and forfeiture of certain property consistent with Defendants' plea agreements.  Neither defendant objected to the sentence.

## F.    Preliminary Forfeiture Order

The government moved for a preliminary order of forfeiture for the two houses specified in the plea agreements as substitute assets to satisfy the personal money judgment of $753,430.  On August 28, 2013, the district court entered a preliminary order of forfeiture for the two houses, which were valued circa $220,000.

## G.    Amended Forfeiture Order

On September 4, 2013, the government moved to amend the preliminary forfeiture order as to the money judgment of $753,430, pursuant to Federal Rule of Criminal Procedure 32.2(e) and 21 U.S.C. § 853(p).[1]  The government sought

---

[1] Section 853(p) mandates forfeiture of substitute property when, as a result of any act or omission of the defendant, any property subject to forfeiture: "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without

8

forfeiture of additional substitute assets, namely, three cars registered in the name of defendant Sosa: a 2007 Cadillac Escalade, a 2012 Dodge Challenger, and a 2013 BMW 740i. The district court granted the government's motion, and, on September 6, 2013, entered an order amending the August 28 forfeiture order to add Defendants' interests in the three cars.

On September 6, 2013, Defendants filed objections to the government's motion to amend the forfeiture order, objecting only to the amount of the money judgment being $753,430. Defendants argued that the government knew of their fraudulent conduct from an early stage but let the fraud continue and the loss accumulate to the current amount of $753,430. According to Defendants, the government could have, but failed to, locate the money during its active investigation of the fraud.

In the district court, Defendants made no objection to the car-aspect of the forfeiture.

On September 10, 2013, Defendants timely appealed the August 28, 2013 preliminary forfeiture order and the September 6, 2013 amended forfeiture order. On September 20, 2013, the district court overruled Defendants' objections and denied their motion to stay the forfeiture pending appeal.

---

difficulty." 21 U.S.C. § 853(p)(1). In such cases, "the court shall order the forfeiture of any other property of the defendant, up to the value" of the unavailable property. Id. § 853(p)(2).

On March 12, 2014, the government moved to dismiss the appeals based on the appeal waivers contained in Defendants' plea agreements. On May 1, 2014, this Court denied the government's motion to dismiss because (1) the district court did not specifically question Defendants about the appeal waivers during the plea colloquy; and (2) the appeal waivers, even if enforceable, did not govern Defendants' claims that their guilty pleas were not knowing and voluntary because they were not informed of certain facts relevant to the forfeiture provisions in their plea agreements.

## II. DISCUSSION

As to the forfeiture orders, Defendants raise two claims of error, which we address in turn.

### A.    Plea Agreements Were Knowing and Voluntary

Defendants argue that they did not knowingly and voluntarily agree to the forfeiture provisions in their plea agreements because the government did not disclose until sentencing that Defendants had perpetrated their months-long fraud through a government cooperator. According to Defendants, the government could have stopped the fraud (and thus, the payments by Medicare) earlier, but instead allowed the loss amount to grow over four months. Defendants contend that, had they known of the government's inaction, they would have contested the amount of forfeiture.

10

Because Defendants did not move to withdraw their pleas prior to sentencing, we review only for plain error.[2] See United States v. Chubbuck, 252 F.3d 1300, 1302 (11th Cir. 2001). In fact, while before the district court, Defendants never moved to withdraw their pleas.

Under plain-error review, the defendant has the burden to show that there is (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights. United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993). If the first three prongs are met, then an appellate court may exercise its discretion to correct the error, but only if (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id.

To be valid, a guilty plea must be a voluntary, knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences. United States v. French, 719 F.2d 387, 390 (11th Cir. 1983). If a defendant is fully aware of a plea's consequences, it must stand unless it was induced by threats, misrepresentations, or improper promises. Id. We have previously suggested that, where there is no evidence of misrepresentation, a lack of information on an issue secondary to guilt does not render a plea involuntary.

---

[2]Defendants' post-sentencing filings did not timely preserve this argument. See Fed. R. Crim. P. 11(e) ("After the court imposes sentence . . . the plea may be set aside only on direct appeal or collateral attack.").

11

See id. at 390 n.6 (defendant was unaware of the possibility of entering into a binding plea).

Here, the record amply demonstrates that Defendants were fully aware of the consequences of their guilty pleas, and Defendants do not suggest that their pleas were induced by government misrepresentation. At the time they signed their plea agreements and the corresponding factual proffers, Defendants knew that the doctor involved in their four-month-long conspiracy was a government cooperator.

Defendants contend that they did not become aware of the full extent of the cooperator's involvement in their fraud until sentencing. While the information provided at the sentencing hearing concerning the government's use of the doctor was more explicit than previously contained in the record, Defendants cannot show any misrepresentation that would render their plea agreements involuntary or unknowing. See id. at 390 & n.6. We therefore find no error, plain or otherwise.

## B.    Second Prong: Forfeiture of Cars Was Not Plain Error

As their second claim, Defendants argue that the government breached the plea agreements by seeking and obtaining forfeiture of any additional assets such as the cars.[3] Specifically, Defendants contend that the plea agreements provided that forfeiture of the two houses, whatever their value, would fully satisfy and

---

[3]On March 17, 2014, this Court granted the parties' joint motion to dismiss the appeal in part as to the 2012 Dodge Challenger—one of the three cars in the amended forfeiture order. The parties sought to have this car released to a third-party lienholder.

extinguish the personal money judgment of $753,430 against them, and that they did not agree to forfeit the cars as well.

In the district court, Defendants did not object to forfeiture of the cars and never argued that the government breached the plea agreements. Thus, our review of this issue is also only for plain error. See Puckett v. United States, 556 U.S. 129, 133-34, 129 S. Ct. 1423, 1428 (2009). As noted above, the first three prongs, Defendants must establish, are that there is (1) error (2) that is plain and (3) that has affected Defendants' substantial rights. Olano, 507 U.S. at 732, 113 S. Ct. at 1776.

We ultimately need not decide whether there was error here, because any error was not plain for several reasons. For an error to be considered plain, the "error must be clear or obvious, rather than subject to reasonable dispute." Puckett, 556 U.S. at 135, 129 S. Ct. at 1429. In the context of plea agreement breaches, the Supreme Court has advised that "[n]ot all breaches will be clear or obvious," such as when the drafting of an agreement leaves the scope of the government's commitments open to doubt. Id. at 143, 129 S. Ct. at 1433.

"At a minimum, court[s] of appeals cannot correct an error . . . unless the error is clear under current law." Olano, 507 U.S. at 734, 113 S. Ct at 1777 (emphasis added). Furthermore, it is well-established in this circuit that, "at least where the explicit language of a statute or rule does not specifically resolve an

issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).

To evaluate whether the government breached a plea agreement, we "determine the scope of the government's promises" and ask "whether the government's actions [were] inconsistent with what the defendant reasonably understood when he entered his guilty plea." United States v. Copeland, 381 F.3d 1101, 1105 (11th Cir. 2004). "The government is bound by any material promises it makes to a defendant as part of a plea agreement that induces the defendant to plead guilty." United States v. Horsfall, 552 F.3d 1275, 1281 (11th Cir. 2008).

First, we review what Defendants' plea agreements said. The agreements did not provide that the government would seek to forfeit only the two houses specified therein. The agreements also did not state that forfeiture of the two houses would "fully satisfy" or extinguish the money judgment. Instead, the plea agreements were clear that, while Defendants specifically agreed to forfeit without issue their interest in the two houses, they also agreed not to contest any forfeiture orders issued against them, which certainly indicated that the forfeiture was not limited to the two houses and that additional property could be forfeited to satisfy the agreed money judgment.

14

The plea agreements also provided that Defendants waived any claim or defense or statute of limitations to the forfeiture, any right to trial on forfeiture, any notice of forfeiture proceedings, and any right to appeal any forfeiture order.  At the time the plea agreements were entered, those provisions would be superfluous and without any relevance if Defendants were only required to forfeit the two houses to extinguish their forfeiture obligations, because they had already agreed to voluntarily forfeit those houses under the terms of their plea agreements.

The plea hearing made clear that Defendants were liable for repaying the agreed $753,430 money judgment to the government, that they could not object to "any source to forfeiture" or otherwise challenge any forfeiture ordered against them, and that the forfeiture order had not yet been finalized.

The use of the term "satisfy" in the house-forfeiture provision of the agreements does not compel a different conclusion.  Defendants attempt to read "satisfy" in isolation without placing it in the context of the other sentences in the agreements.  And as noted earlier, the agreements did not state that the house-forfeiture would fully satisfy or extinguish the money judgment.

In addition, the words "satisfy" or "satisfaction" do not appear in the applicable forfeiture statutes or rules: 18 U.S.C. § 982 (requiring criminal forfeiture in certain cases), 21 U.S.C. § 853 (governing forfeiture under § 982, including the forfeiture of substitute property), or Federal Rule of Criminal

15

Procedure 32.2 (the procedural rules on criminal forfeiture).  There is no precedent from the Supreme Court or this Court interpreting the meaning of "satisfy" in the forfeiture context or otherwise resolving this issue.  Defendants have not identified any controlling authority in support of their interpretation.

Given all of the factual circumstances of this case, it was not "clear under current law" that the government patently breached the plea agreements by seeking forfeiture of the cars or that any such breach should have been "obvious" to the district court.  See Olano, 507 U.S. at 734, 113 S. Ct at 1777.

## C.    Fourth Prong: Discretion to Correct Forfeited Error

Under the fourth prong of the plain-error test, we have discretion to correct a plain error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  Olano, 507 U.S. at 732, 113 S. Ct at 1776.  Not every breach of a plea agreement seriously affects the integrity of judicial proceedings— courts must consider countervailing factors on a case-by-case basis.  Puckett, 556 U.S. at 142-43, 129 S. Ct. at 1433 (characterizing as "ludicrous" the defendant's receipt of a sentencing reduction for acceptance of responsibility, as called for in the plea agreement, when the defendant continued his criminal conduct after entering into the agreement).

Even assuming arguendo that any error was plain, the fourth prong of the plain-error test weighs against its correction.  There is a disparity of over $500,000

between the agreed money judgment of $753,430 and the value of the two houses specified in the plea agreements. A review of Defendants' assets in the undisputed PSIs suggests that Defendants were not forthright in disclosing the location of their criminal proceeds. Under these circumstances, we cannot say that allowing forfeiture of Defendants' interests in two of their six cars seriously affected "the fairness, integrity or public reputation of judicial proceedings." See Olano, 507 U.S. at 732, 113 S. Ct at 1776. Accordingly, we conclude that Defendants have not demonstrated plain error as to this issue.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's orders of forfeiture.

**AFFIRMED.**