[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13978

_____

D.C. Docket No. 1:13-cr-00499-SCJ-AJB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ZERRY FEASTER,
a.k.a. Zerry Travis,
a.k.a. Zerry West,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 25, 2015)

Before ROSENBAUM and FAY, Circuit Judges, and MIDDLEBROOKS,[*] District Judge.

ROSENBAUM, Circuit Judge:

Sometimes turning lemons into lemonade can be difficult. But making felony convictions into misdemeanor convictions is even more challenging. It takes an act of Congress—an act of Congress that did not occur in this case.

Zerry Feaster was convicted of seven felony counts of theft of public money, in violation of 18 U.S.C. § 641. The stolen amounts charged in the seven counts totaled $2,300. Feaster now asks us to hold that her seven felony convictions are actually misdemeanor convictions because each separate conviction involves a sum that does not exceed $1,000. But Feaster's proposed interpretation of § 641 would require us to ignore the unambiguous language of the statute that designates all § 641 convictions felonies first and reduces them to misdemeanors second only if the sum of the amounts charged in all of the § 641 convictions in the defendant's case equals $1,000 or less. Feaster also urges us to conclude that the district court committed legal error and that it clearly erred when it imposed the sophisticated-means enhancement in determining her guidelines level. Because the district court correctly determined Feaster's § 641 convictions to be felonies and because it did

_____

[*] The Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

not err or clearly err in applying the sophisticated-means enhancement, we now affirm the rulings of the district court.

## I.

Zerry Feaster was employed with the United States Department of Veteran's Affairs ("VA"). Beginning in 2008, Feaster worked at the VA Medical Center in Decatur, Georgia, assigned to the VA Police Services office but working specifically as the secretary for the Chief of Police Services.

As part of her employment, Feaster's responsibilities included purchasing office supplies and equipment for uniformed officers and performing general timekeeping functions. To help her execute these duties, the government arranged for Feaster to receive a Government Purchase Card, which was a U.S. Bank credit card ("Purchase Card"). As the name suggests, the Purchase Card was for the use of employees to make purchases authorized by the VA. Employees were not allowed to use the Purchase Card for personal expenses.

To buy items for the VA with the Purchase Card, Feaster had to log into an electronic system called VISTA/IFCAP and create a purchase order. On the purchase order, Feaster had to identify the items and quantities to be purchased. An approving official would review the purchase order, determine whether the proposed purchases were reasonable and funds were available, and, if appropriate, approve the purchase order. Once the purchase order was approved, Feaster would

3

make the approved purchases with the Purchase Card and would later amend the purchase order in the VISTA/IFCAP electronic system to reflect the precise items and quantities that were actually obtained.  After she reconciled the orders, Feaster would then notify the approving officer that charges were pending for review and approval.  Upon approving the charges, the VA would pay the amounts charged to the Purchase Card.

From February 17, 2010, through February 17, 2012, Feaster used the Purchase Card to buy prepaid gift cards that she then expended on personal items and activities.  In order to hide these prohibited purchases, Feaster created fictitious purchase orders through the VISTA/IFCAP system.

Under this scheme, Feaster first requested and obtained approval to obtain office supplies from Office Depot, usually in an amount over $2,000.  Then, instead of buying the approved items, Feaster acquired hundreds of dollars' worth of prepaid gift cards.  After making the unauthorized purchases, Feaster reconciled the purchase orders in the VISTA/IFCAP system so that the total amount to be paid on the Purchase Card matched the total amount Feaster had spent at Office Depot.  Feaster did not disclose that she had bought gift cards with the Purchase Card and instead made fictitious representations about the quantities of office supplies purchased.  In this way, Feaster made it appear that the charges on the Purchase Card were for office supplies or other items relating to the VA Police

4

Services office instead of for personal gift cards. Feaster used the gift cards to pay for jewelry, luxury accessories, and other personal expenses.

All told, Feaster knowingly converted to her use $88,264.47 of the VA's money into gift cards and other questionable purchases made during the same time frame. She did this without the knowledge and authorization of a VA approving official.

The VA identified Feaster's misconduct after a supervisor reported that Feaster was misusing her Purchase Card. Upon being confronted with the unauthorized purchases, Feaster initially denied having any knowledge of them but eventually admitted to using the Purchase Card for personal use. Feaster also conceded that no one else had access to the Purchase Card, that the card had never been out of her possession, and that she was the only person authorized to make purchases with the Purchase Card.

On December 17, 2013, a federal grand jury charged Feaster with seven counts of theft of public money, in violation of 18 U.S.C. § 641 (Counts 1-7), and four counts of making false statements, in violation of 18 U.S.C. § 1001 (Counts 8-12). Each of the seven § 641 counts accused Feaster of stealing $400 or less. Feaster pled guilty to all counts without the benefit of a written plea agreement.

The Presentence Investigation Report ("PSR") assigned Feaster a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2). It also assessed an 8-level

enhancement under U.S.S.G. § 2B1.1(b)(1)(E) because the loss amount of $88,264.47 exceeded $70,000 but was not more than $120,000.  Additionally, the PSR suggested a 2-level enhancement under U.S.S.G. § 3B1.3 for abuse of public trust and a 3-level downward adjustment for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b), yielding a total offense level of 13.

Feaster had no criminal-history points and was assigned a criminal-history category of I.  Based on Feaster's criminal-history category of I and total offense level of 13, the guideline range was 12 to 18 months' imprisonment.  The PSR classified all of Feaster's offenses as felonies and determined that the statutory maximum penalty for Counts 1-7 was 10 years' imprisonment each and 5 years' imprisonment for each of Counts 8-12.

## II.

Before the sentencing hearing, the parties filed memoranda addressing, among other issues, whether the language of § 641 rendered Counts 1-7 felony or misdemeanor charges and whether U.S.S.G. § 2B1.1(b)(10)(C)'s enhancement for "sophisticated means" was applicable.[1]  After hearing argument from both parties at the sentencing hearing, the district court determined that, under § 641's plain language, each count was a felony in its own right since the aggregate sum from all

---

[1] Section 2B1.1(b)(10)(C) states that "[i]f . . . the offense otherwise involved sophisticated means, increase by 2 levels."

6

the convicted counts exceeds $1,000.    As for the sophisticated-means enhancement, the district court concluded that it was also applicable.

At the conclusion of the sentencing hearing, the district court calculated Feaster's total offense level to be 13 and her criminal-history category to be I, yielding a guideline range of 12 to 18 months' imprisonment and supervised release of one to three years.  The district court sentenced Feaster to 13 months' imprisonment, 3 years' supervised release, and 50 hours of community service and ordered her to pay $88,264.47 in restitution and $1,200 in special assessments ($100 for each of Counts 1-12).[2]  For the reasons set forth below, we now affirm.

## III.

Feaster contends that Counts 1-7 under § 641 were improperly charged and sentenced as felonies because each individual count was for the theft of less than $1,000, so § 641 makes each count a misdemeanor.  We conclude that Feaster's proposed construction of § 641 contradicts the express language of the statute.

We review *de novo* issues of statutory construction.  *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1383 (11th Cir. 2011).  Our statutory analysis must begin with the language of the law we are considering.  *Owens v. Samkle Auto. Inc.*, 425 F.3d 1318, 1321 (11th Cir. 2005).  When the statutory language is clear, our analysis ends with it as well.  *Id.*  Section 641 provides, in relevant part,

---

[2] If the seven § 641 counts were misdemeanors, the special assessment for each count would have been $25 instead of $100.  *See* 18 U.S.C. § 3013.

> Whoever embezzles, steals, purloins, or knowingly converts to his use . . . any record, voucher, money, or thing of value of the United States or of any department of agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both; ***but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, [the defendant] shall be fined under this title or imprisoned not more than one year, or both.***

18 U.S.C. § 641 (emphasis added). The plain language of this statute reflects that a person who embezzles, steals, purloins, or converts United States property is generally guilty of a felony. *United States v. Lagrone*, 773 F.3d 673, 677 (5th Cir. 2014) ("*Lagrone II*"). Under this language, the "but if" clause sets forth the only exception to the general felony rule established by the first clause of the statute. *See id.* According to that limited exception, separate counts of § 641 violations constitute a misdemeanor if they are for $1,000 or less, *only* if the total amount charged in all § 641 counts of conviction adds up to $1,000 or less. In other words, the "but if" clause is a mitigation clause that reduces what is otherwise a felony to a misdemeanor when $1,000 or less is charged in all of the § 641 counts of conviction combined. The fact that the second clause acts as a safety valve for thefts of a total of $1,000 or less does not somehow cause felony convictions that do not qualify for the exception because they add up to more than $1,000 to become misdemeanors, simply because one or more separate counts of conviction each involves $1,000 or less. *See United States v. Venti*, 687 F.3d 501, 504 (1st

8

Cir. 2012) (affirming defendant's nine felony convictions where eight § 641 counts aggregated to a total of $807.89 and the ninth count, though not for a precise amount, exceeded $330).

The structure of § 641 also belies Feaster's contention that each count charging $1,000 or less constitutes a misdemeanor, regardless of the aggregate amount charged under all § 641 counts. The aggregation provision in § 641 parallels language found in other sections within the federal Criminal Code. Section 641 and others like it contain

> a lengthy primary clause describing certain illegal conduct and providing for felony punishment thereof; a semicolon; and, finally, a second clause—beginning with the word 'but'—which refers back to the illegal conduct described in the main clause and provides for misdemeanor punishment in cases where the dollar value associated with the aforementioned illegal conduct does not exceed $1,000. . . . In other words, the above statutes are felony criminal statutes that include a narrow misdemeanor exception in the event that the illegal conduct results in de minimus gain.

*United States v. Tupone*, 442 F.3d 145, 152 (3d Cir. 2006) (emphasis omitted) (internal citations omitted) (interpreting 18 U.S.C. § 1920). As the Third Circuit explained regarding this structural framework as it arises in 18 U.S.C. § 1920, it is not "the main thrust of the entire statute to create a misdemeanor, with the latter clause carving out a narrow category of felony liability." *Id.* at 152.

9

Nor does the vacated opinion in *United States v. Lagrone* ("*Lagrone I*"), 743 F.3d 122 (5th Cir.), *reh'g granted and opinion rev'd*, 773 F.3d 673 (5th Cir. 2014), on which Feaster relies, help her cause. Even not considering the fact that the very panel that issued *Lagrone I* unanimously vacated it in favor of the analysis in *Lagrone II*, the reasoning in *Lagrone I* clashes with the plain language of § 641. In *Lagrone I*, the Fifth Circuit expressed concern that the construction of § 641 set forth above "permits retroactively changing the penalty for what would otherwise be misdemeanor offenses to penalties for felonies if they are charged in the same case as subsequent thefts that exceed $1,000 in the aggregate." 743 F.3d at 125. The problem with this construction of § 641 arises from the fact that it assumes that all violations of the statute that involve amounts of $1,000 or less are misdemeanors, regardless of the sum of the violations. But this stands in direct contradiction to the statutory language, which makes all violations felonies initially and reduces them to misdemeanors later only if the sum of all violations does not exceed $1,000. In short, the statutory language and structure mandate our holding today that each § 641 count, no matter the amount involved in the violation, constitutes a felony unless the aggregate amount stolen or converted in all convicted § 641 counts in the charging instrument totals $1,000 or less.

**IV.**

Feaster also challenges the district court's application of the sophisticated-means enhancement in determining her guideline level.[3]  Under this enhancement, two points are added to the defendant's guideline level "if the offense . . . involved sophisticated means."   U.S. Sentencing Guidelines Manual § 2B1.1(b)(10)(C) (U.S. Sentencing Comm'n 2014).

In  explaining  its  reasoning  for  imposing  the  sophisticated-means enhancement, the district court stated,

> The court has researched this matter and looked at the notes in this matter.  The court finds that the totality of the scheme makes Ms. Feaster's actions sophisticated means.  The conduct that was apparently coordinated again is sophisticated.  One particular action itself may not be sophisticated, but when you put the totality of the scheme together, that can make a sophistication.  Over a two-year period Ms. Feaster concealed her purchase of gift cards by creating fictitious purchase orders.  She made fictitious representations about the quantities of the office supplies and this resulted in her taking over $88,000.

---

[3] The government argues that Feaster did not raise before the district court the specific challenges to the application of the sophisticated-means enhancement that she presents on appeal.  For this reason, the government contends, plain-error review applies to this issue.  *See United States v. Shelton*, 400 F.3d 1325, 1328-29 (11th Cir. 2005) (When an issue is not raised in the district court, our review is for plain error only, meaning that the defendant must show "(1) error, (2) that is plain, and (3) that affects substantial rights," and if all three requirements are satisfied, we may then choose to exercise our discretion to notice a forfeited error, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.") (citation and internal quotation marks omitted).  We need not determine whether Feaster forfeited her precise arguments concerning the sophisticated-means enhancement because, as explained below, even if she did not, she has not demonstrated that the district court clearly erred in applying the enhancement.

Feaster asserts that the district court both committed legal error by allegedly applying the wrong legal standard for evaluating whether she engaged in sophisticated means to commit the offense and that the court clearly erred in determining that her conduct involved sophisticated means.

We review *de novo* the district court's legal interpretations of the Sentencing Guidelines. *United States v. Zaldivar*, 615 F.3d 1346, 1350 (11th Cir. 2010). As for the district court's finding that sophisticated means were used, we review that determination for clear error. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (citation omitted). Under this deferential standard of review, we will not reverse a district court's findings "unless we are left with a definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted). After careful review, we find that the district court did not apply the incorrect legal standard, nor did it clearly err in applying the sophisticated-means enhancement.

We start our evaluation with the language of the guideline, considering both the guideline and the commentary. *United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003). The language of the sophisticated-means guideline, in and of itself, sheds no light on the meaning of the phrase "sophisticated means," stating simply that if the offense involved sophisticated means, two points are added to the offense level.

12

But the Application Note accompanying § 2B1.1(b)(10)(C) provides some insight. It describes "sophisticated means" as follows:

> means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

*Id.*, Application Note at 9(B). We have previously stated that the illustrations that the Application Note sets forth are a "nonexclusive list of examples of sophisticated means of concealment[.]" *United States v. Campbell*, 491 F.3d 1306, 1316 (11th Cir. 2007). In addition, we have looked to the "conduct as a whole, not . . . each individual step," *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015), to determine whether the "totality of the [conduct]" sufficiently supports application of the enhancement, *Ghertler*, 305 F.3d at 1268.

Here, Feaster takes issue with the district court's application of the "totality of the scheme" standard. But as noted above, we have repeatedly endorsed this consideration in determining whether the sophisticated-means enhancement applies.

Nor, as Feaster argues, do the district court's references to "conduct that was apparently coordinated," the total amount involved in the scheme, or the two-year

13

lifespan of the scheme somehow render the district court's application of the "totality of the scheme" standard legal error. Feaster correctly observes that we have used the phrase "coordinated conduct" in our caselaw to describe the actions of more than one participant in a scheme and to support the imposition of the sophisticated-means enhancement. *See, e.g., United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011) (quoting *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005)). And because Feaster was the sole participant in her crime, she asserts that it was reversible error for the district court to rely on "coordinated conduct" as a reason to impose the enhancement. But it is clear when the district court's statement is read in context that the district court was referring to the number of different and repetitive acts that Feaster undertook during the totality of the scheme. As discussed previously, that is a permissible consideration.

As for the district court's references to the length of the scheme and the loss inflicted by it, those, too, can be acceptable factors to evaluate in determining whether the totality of the scheme employed sophisticated means. For example, in *Ghertler*, though we acknowledged that Ghertler "sometimes made little or no effort to conceal either the fact of his fraud or his identity," we nonetheless held that "the totality of these activities carried out *over an extended period of time*" supported the imposition of the sophisticated-means enhancement. 605 F.3d at 1268 (emphasis added). In other words, when a larger amount of money is stolen

14

gradually and is not discovered over a long period, the length of time for which the conduct is not detected can reflect on the sophistication of the scheme.  Regardless of whether the defendant undertook affirmative acts of concealment, the scheme itself may be designed in a sophisticated way that makes it unlikely to be detected, allowing it to continue for an extended period and to impose larger losses.  In short, we find that the district court did not commit error in the standard that it applied to evaluate whether Feaster had used sophisticated means.

Likewise, we do not find that the district court clearly erred in determining that the facts in this case support imposition of the sophisticated-means enhancement.  Though Feaster argues that she did not participate in any of the specific acts of concealment described in the Application Note, our caselaw demonstrates that we have sustained application of the sophisticated-means enhancement where defendants have engaged in concealment of their crimes in a variety of ways not expressly stated in the Application Note.

In *Campbell*, for example, the defendant was convicted of tax fraud.  491 F.3d at 1308.  Campbell, who served as the mayor of Atlanta, solicited and accepted bribes from those seeking to do business with the city, and he did not report these funds on his income-tax returns.  *Id.* at 1309.  In addition, Campbell affirmatively sought to conceal the payments by using campaign accounts and

credit cards issued to others to expend the improperly obtained funds. *Id.* at 1315.

We upheld the application of the sophisticated-means enhancement, explaining,

> The fact that Campbell did not use offshore bank accounts or transactions through fictitious business entities is unavailing. . . . In terms of the sophistication of the concealment, we see no difference between "hiding assets or transactions . . . through the use of fictitious entities, corporate shells, or offshore financial accounts," . . . and hiding assets or transactions through the use of a straw man or campaign fund.

*Id.* at 1316 (citation omitted).

We also affirmed application of the sophisticated-means enhancement in *United States v. Clarke*, 562 F.3d 1158 (11th Cir. 2009), even though the ways that the defendant concealed his crime there did not include any of the methods set forth in the Application Note. Like the defendant in *Campbell*, Clarke was also convicted of tax fraud. *See Clarke*, 562 F.3d at 1160. He concealed the extent of his income by depositing his salary into accounts that were not in his own name, instructing his employer to make payments from these accounts to his personal creditors, and directing his employer to pay his insurance premiums to the insurance carriers. *Id.* at 1166. In upholding the application of the sophisticated-means enhancement, we again observed that the Application Note did not limit the ways in which a defendant could use sophisticated means to conceal his crime. *Id.* at 1165; *see also Moran*, 778 F.3d at 977 (affirming imposition of sophisticated-means enhancement where defendants used widespread kickbacks and the

16

falsification of group therapy notes in committing healthcare fraud, even though the defendants did not employ any methods cited in the Application Note).

Here, we cannot say that the district court clearly erred in holding that the totality of the scheme evidenced sophisticated means. First, Feaster used her inside information and her position at the VA to perpetrate the fraud. *See Barrington*, 648 F.3d at 1199 (affirming the district court's consideration of the defendants' use of inside information as a factor supporting imposition of the sophisticated-means enhancement). Neither an outsider nor most other employees of the VA could have carried out the crime that Feaster committed. Second, each time that Feaster stole VA funds, she performed at least three affirmative acts of concealment: (1) preparing a fraudulent purchase order to obtain approval in the first place to use the Purchase Card, (2) buying gift cards with the Purchase Card, thereby building in another layer of concealment similar to the straw man or accounts under other names used in *Campbell* and *Clarke*, to obscure her fraudulent personal purchases, and (3) making fictitious entries in the VA's system to reconcile the original purchase order with the amount of money that she charged to the Purchase Card to obtain payment for the charges that she fraudulently incurred. Third, Feaster repeated these same steps numerous times during the life of the scheme. Fourth, apparently because of the design of the scheme and Feaster's proficiency in running it, the scheme went undetected for two years.

17

In light of our precedent and based on this record, we cannot say that we are "left with a definite and firm conviction that a mistake [was] committed" when the district court applied the sophisticated-means enhancement. *See United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005) (quotation marks and citation omitted). We therefore affirm the district court's imposition of the enhancement.

## V.

We hold that the district court did not err in determining that each of Feaster's § 641 convictions constitutes a felony since the aggregate amount stolen in the counts of conviction exceeded $1,000. Nor did the district court commit either legal error or clear error in finding that the sophisticated-means enhancement applied to Feaster's offense conduct. For these reasons, the district court's order is **AFFIRMED**.