[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 22-12837

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ARMANDO VALDES,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20590-KMW-1

————————————

Before WILSON, LUCK, and HULL, Circuit Judges.

PER CURIAM:

After pleading guilty, Armando Valdes appeals his 60-month sentence for health care fraud, in violation of 18 U.S.C. § 1347. Valdes's conviction and sentence arise out of his scheme to submit millions of dollars in fraudulent medical claims to United Healthcare and Blue Cross Blue Shield for intravenous infusions of Infliximab, an expensive immunosuppressive drug. These infusions, purportedly given to patients at Valdes's medical clinic, Gasiel Medical Services ("Gasiel"), were either not provided or were medically unnecessary.

On appeal, Valdes argues that the district court erred by: (1) applying a 22-level increase in his offense level under U.S.S.G. § 2B1.1(b)(1) because the loss amount exceeded $25 million; (2) applying a two-level increase under U.S.S.G. § 2B1.1(b)(10)(C) for using sophisticated means; (3) applying a two-level increase under U.S.S.G. § 3B1.3 for abusing a position of trust or using a special skill; and (4) ordering the forfeiture of his primary residence as substitute property. After review, we affirm Valdes's sentence.

## I.  LOSS AMOUNT

Under U.S.S.G. § 2B1.1(b)(1), a defendant's offense level increases with the amount of "loss" caused by the offense. In Valdes's case, his base offense level was increased by 22 levels because the district court found that the loss amount was $38

million, and thus more than $25 million, as provided in § 2B1.1(b)(1)(L).

## A.  U.S.S.G. § 2B1.1(b)(1)

Section 2B1.1(b)(1)(L) provides that a defendant's base offense level is increased by 22 levels if the loss from the fraud offense was more than $25 million but less than $65 million. U.S.S.G. § 2B1.1(b)(1)(L),(M). The commentary to § 2B1.1 defines loss as the greater of either the actual loss, which is the "reasonably foreseeable pecuniary harm that resulted," or the intended loss, which is the "pecuniary harm that the defendant purposely sought to inflict." *Id.* § 2B1.1 cmt. n.3(A)(i)-(ii). Intended loss includes harm "that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii). Insurance fraud, in which the claim exceeded the insured value, is cited as an example of impossible or unlikely harm. *Id.*

The Guidelines do not require a precise determination of loss. *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). Instead, the district court need make only a reasonable estimate based on the available information. *Id.*; *see also* U.S.S.G. § 2B1.1 cmt. n.3(C).

While the government has the burden to prove the loss amount with specific, reliable evidence, the district court may make its factual findings as to the loss amount based on, among other things, evidence presented at trial or sentencing or on the undisputed statements in the presentence investigation report ("PSI"). *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015).

We review a district court's loss determination for clear error. *Barrington*, 648 F.3d at 1197.

## B. Analysis

Here, Valdes has not shown the district court's loss amount of $38 million was clear error. In his factual proffer and at his plea hearing, Valdes admitted that through Gasiel, he submitted approximately $33 million in fraudulent claims to United Healthcare and approximately $5 million in fraudulent claims to Blue Cross Blue Shield. Because there is a strong presumption that those statements are true, *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994), the district court could rely on them in determining the loss amount.

Valdes contends some of the $33 million submitted to United Healthcare was attributable to duplicate claims and therefore should not have been included in the intended loss amount.[1] Valdes also claims the intended loss amount "was the 30% contracted payment" under United Healthcare's pricing payment agreement. There are several problems with Valdes's arguments.

First, for purposes of the loss amount under § 2B1.1, the intended loss includes unlikely amounts of pecuniary harm, such

---

[1] Valdes has never disputed that the intended loss amount was the appropriate measure of loss in his case or argued that the definition of loss in the Guidelines commentary should not apply. He has merely argued that duplicate claims should not be part of the intended loss because he did not intend them to be paid.

as claims that exceed the insured value.  U.S.S.G. § 2B1.1 cmt. n.3(A)(ii); *United States v. Moss*, 34 F.4th 1176, 1191-92 (11th Cir. 2022) (affirming district court's use of the amount billed, rather than the amount the defendant expected to be reimbursed, even though it was unlikely the defendant would be paid the full billed amount).  Thus, even if United Healthcare was unlikely to reimburse Valdes for the entire amount billed or for duplicate claims, those claims were nonetheless properly included in the intended loss amount.

Second, at the sentencing hearing, Valdes's own fraud analyst testified that, even accounting for duplicate claims, the total loss amount was above $25 million, the threshold for the 22-level increase in Valdes's offense level.  Further, Valdes did not present any testimony or evidence at sentencing to support his assertion that he intended United Healthcare to reimburse him only 30% of the billed amount.[2]  *See Moss*, 34 F.4th at 1192 (affirming where the defendant did not point to any evidence, such as revenue projections based on the actual reimbursable amount, showing he intended to obtain less than the amount billed).  Accordingly, Valdes has not shown clear error in the district court's determination of the loss amount or its application of the 22-level increase in Valdes's offense level under § 2B1.1(b)(1).

---

[2] Valdes himself did not testify.  Valdes's expert testified about the duplicate billing but not about an agreement with United Healthcare to reimburse only 30% of the amount billed.

## II.  SOPHISTICATED MEANS ENHANCEMENT

Valdes also challenges the district court's application of a sophisticated means enhancement under U.S.S.G. § 2B1.1.  Valdes argues that his offense involved the largely repetitive act of billing for a service that was not provided and was easily detectable.

### A.  U.S.S.G. § 2B1.1(b)(10)(C)

If a defendant's fraud offense involved sophisticated means, his offense level is increased by two levels.  U.S.S.G. § 2B1.1(b)(10)(C).  The commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *Id.* § 2B1.1 cmt. n.9(B).  Hiding assets or transactions using fictitious entities or corporate shells ordinarily indicates sophisticated means.  *Id.*

Whether conduct is sophisticated is based on the conduct as a whole, not on the individual steps.  *Barrington*, 648 F.3d at 1199. Repetitive and coordinated conduct can be a sophisticated scheme even when no one step is particularly complicated.  *Id.*  When a large amount of money is stolen gradually and the fraud is not discovered over a long period, the length of time for which the conduct is not detected can reflect the sophistication of the scheme. *United States v. Feaster*, 798 F.3d 1374, 1381 (11th Cir. 2015).

In addressing a sophisticated means enhancement, we review a district court's factual findings for clear error and its application of the guideline provision to those facts *de novo*.  *See United States v. Humber*, 255 F.3d 1308, 1311 (11th Cir. 2001).

## B. Analysis

Here, we find no error in the district court's application of the two-level sophisticated means enhancement.

Based on his factual proffer and undisputed facts in the PSI, Valdes operated an elaborate, years-long scheme to defraud insurance companies for expensive Infliximab infusions, obtaining over $7 million as a result. The large amount of money defrauded and the six-year period the scheme went undetected support a finding of sophisticated means. *See Feaster*, 798 F.3d at 1381. The fact that Gasiel was a real medical clinic that provided other, legitimate medical services to real patients, including primary care services and other intravenous infusions, made the fraud scheme involving Infliximab infusions more difficult to detect.

Contrary to Valdes's claims, his fraudulent billing was not simple, repetitive conduct. To be paid for the fraudulent Infliximab infusions and related services, Valdes had to submit itemized claim forms to the insurance companies that required various information, including descriptions of the services provided and billing codes. These claim forms had to be prepared in compliance with applicable laws and regulations, including certifying that the billed services were medically necessary and actually provided. This is the kind of repetitive, yet complex, conduct that qualifies as sophisticated means. *See Barrington*, 648 F.3d at 1199.

Moreover, Valdes, the beneficial owner and operator of Gasiel, took steps to conceal his ownership of Gasiel and his involvement in the fraud. At the sentencing hearing, FBI Special

Agent Zachary Mandell testified that Valdes was not listed in Gasiel's corporate records despite being the actual owner and operator.  Valdes hid behind two licensed doctors, Hilario Isaba and Ramon Santiago, who claimed no ownership interest in Gasiel and did not prescribe Infliximab.  Valdes, who had medical training in Cuba, held himself out to patients as a doctor, but Isaba and Santiago were identified as the referring providers for all $38 million in false claims.[3]  In addition, Isaba was listed as Gasiel's registered agent and president.  Valdes's false paper trail initially worked, as Isaba was the original target of Special Agent Mandell's investigation.

In light of these facts, the district court properly applied a two-level sophisticated means enhancement.

### III.  ABUSE-OF-TRUST ENHANCEMENT

Valdes also argues that the district court's application of U.S.S.G. § 3B1.3's abuse-of-trust enhancement was unwarranted.

### A.  U.S.S.G. § 3B1.3

If a defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the

---

[3] On appeal, Valdes argues that he never held himself out as a doctor at the clinic.  However, Valdes did not object to that factual statement in paragraph 13 of the PSI, so it is deemed admitted for sentencing purposes.  *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006).  Special Agent Mandell also testified that many of the clinic patients he interviewed referred to Valdes as "Dr. Armando" and that Valdes dispensed pills to patients and sometimes reviewed charts and test results with patients.

commission or concealment of the fraud offense, the sentencing court increases his offense level by two levels. U.S.S.G. § 3B1.3. A special skill is one not possessed by members of the general public and usually requires substantial education, training, or licensing. *Id.* § 3B1.3 cmt. n.4. Being a doctor is a type of special skill. *Id.*

The district court applied the two-level enhancement because: (1) Valdes engaged in activities consistent with what a doctor would do and (2) the clinic's patients thought he was a doctor.

## B. Analysis

On appeal, the parties vigorously dispute whether Valdes—who trained as a doctor in Cuba but was not licensed in the United States—occupied, and abused, a position of trust vis-à-vis the clinic patients.

We need not answer that question, however, because the enhancement also applies if Valdes used a special skill to facilitate the commission of the fraud scheme. The undisputed facts show Valdes used his skills as a trained doctor, whether licensed or not, to facilitate his fraud by submitting false medical claims. Given that Valdes used a special skill in the commission of his offense, the district court properly applied § 3B1.3's two-level enhancement.

## IV. FORFEITURE OF VALDES'S RESIDENCE

Valdes argues the district court erred by ordering the forfeiture of his home as substitute property. Valdes admits that as

part of his plea agreement, he agreed to forfeit his primary residence as substitute property. Valdes claims, however, that this agreement was not voluntary because the district court failed to advise him that his home was a substitute forfeiture asset during the plea colloquy, in violation of Federal Rule of Criminal Procedure 11.

## A. General Principles

A district court must order a defendant guilty of a federal health care offense to forfeit property derived, directly or indirectly, from the commission of the offense. 18 U.S.C. § 982(a)(7). Further, the district court is required to order the forfeiture of other property of the defendant, i.e., substitute property, if any property derived from the commission of the offense cannot be forfeited as a result of the defendant's actions. 21 U.S.C. § 853(p).

As to Valdes's guilty plea, a district court must ensure that a defendant's guilty plea is knowing and voluntary. *United States v. Sosa*, 782 F.3d 630, 636 (11th Cir. 2015). To that end, the district court accepting a guilty plea must comply with Rule 11 and, in particular, address the three core concerns by ensuring that (1) the guilty plea is free from coercion, (2) the defendant understands the nature of the charges, and (3) the defendant understands the consequences of his plea. Fed. R. Crim. P. 11(b); *United States v. Utsick*, 45 F.4th 1325, 1337-38 (11th Cir. 2022).

To comply with the third core concern, "Rule 11(b)(1) provides a list of rights and other relevant matters about which the

court is required to inform the defendant prior to accepting a guilty plea, *including . . . the possibility of forfeiture.*"  *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (emphasis added); Fed. R. Crim. P. 11(b)(1)(J) (requiring the district court to inform the defendant of "any applicable forfeiture" and determine that the defendant understands it).

## B.  Guilty Plea

The record shows that the forfeiture allegations in Valdes's indictment *and* the plea agreement he signed both expressly identified Valdes's primary residence by address as being substitute property potentially subject to forfeiture.

Then, at his plea hearing, Valdes confirmed to the district court that he had read, thoroughly reviewed with his lawyer, and understood the indictment and plea agreement, both of which were translated into Spanish.  The district court also reviewed the forfeiture provision in Valdes's plea agreement, and explained, among other things, that Valdes "not only agree[d] to give up property that was directly derived from this crime," but also "to give up what is known as substitute assets."  Valdes responded that he understood the forfeiture provision.

## C.  Plain Error Review

The day before sentencing, the government filed a motion for a preliminary order of forfeiture that, among other things,

forfeited Valdes's primary residence as substitute property.[4] Valdes did not oppose the motion or object to the proposed forfeiture of his residence before or during his sentencing.

In fact, Valdes did not raise any issue about the forfeiture of his home *until after his sentencing*, at a status conference at which Valdes's trial attorney was permitted to withdraw. Valdes also did not object to the adequacy of his guilty plea proceedings or move to withdraw his guilty plea, despite being given the opportunity to do so with his newly appointed counsel.

As such, Valdes agrees that our review of his forfeiture issue is for plain error only. *See United States v. Monroe*, 353 F.3d 1346, 1349 (11th Cir. 2003); *see also Sosa*, 782 F.3d at 636 & n.2 (concluding the defendants' "post-sentencing filings did not timely preserve" the issue of whether they knowingly and voluntarily agreed to the forfeiture provisions in their plea agreements).

Under plain error review, (1) there must be error; (2) that is plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Monroe*, 353 F.3d at 1349. When neither the Supreme Court nor this Court has resolved an issue, there can be no plain error. *Sosa*, 782 F.3d at 637. We may review the whole

---

[4] The government's motion for a preliminary forfeiture order sought forfeiture of Valdes's primary residence as substitute property because the government was unable to locate all of the directly forfeitable property.

record when determining whether acceptance of a plea was plain error. *United States v. Vonn*, 535 U.S. 55, 59, 74 (2002).

## D. Analysis

Here, we strongly presume Valdes's statements made during the plea colloquy are true. *See Medlock*, 12 F.3d at 187. In these statements, Valdes acknowledged he had read and understood his indictment and plea agreement.

Valdes has not explained how he could have read and thoroughly reviewed the indictment and plea agreement with his attorney without understanding that the substitute property potentially subject to forfeiture was his primary residence. Indeed, his primary residence was the *only* substitute property specifically identified in the documents. And the indictment spelled out that under certain circumstances caused by Valdes, the government was "entitled to the forfeiture of the substitute property."

If that's not enough, at sentencing Valdes's attorney stressed in mitigation that Valdes had agreed to forfeit "five properties"—his primary residence was one of the five real properties listed in the plea agreement—and that Valdes would be homeless after his release from prison. There are no indications in the record that Valdes disagreed with his attorney's statements, corroborating that Valdes had agreed to forfeit his primary residence. The record as a whole reflects that Valdes understood that his primary residence was the substitute property that could be subject to forfeiture.

Valdes points out that during the plea colloquy, the district court did not specifically mention his home, define "substitute

property," or explain the legal ramifications of having his home listed as substitute property.  Valdes does not cite any binding precedent from this Court or the Supreme Court requiring such a detailed discussion of the forfeiture provision to satisfy the requirements of Rule 11.  In the absence of such precedent, the district court's failure to discuss the substitute property in more detail cannot be plain error.  *See Sosa*, 782 F.3d at 637.

Because Valdes has shown no plain error in the district court's accepting his guilty plea as to the forfeiture allegations, he has not shown the district court erred in ordering the forfeiture of his primary residence as substitute property.

**AFFIRMED**